The BOARD OF TRUSTEES OF the CHICAGO PLASTERING INSTITUTE PENSION TRUST FUND; the Board of Trustees of the Chicago Plastering Institute Health and Welfare Trust Fund; the Chicago Plastering Institute; the Board of Trustees of the Masons' Health and Welfare Fund, Local 56, DuPage County, Illinois; and the Board of Trustees of the Masons' and Plasterers' Pension Fund, Local 56, DuPage County, Plaintiffs,

v.

WILLIAM A. DUGUID COMPANY, Defendant.

No. 87 C 10768.

United States District Court, N.D. Illinois, E.D.

April 5, 1991.

Joseph M. Burns, Martin J. Burns, Jacobs, Burns, Sugarman & Orlowe, Chicago, Ill., for plaintiffs.

Paul T. Lively, Querrey & Harrow, Charles E. Murphy, Robert P. Casey, Murphy, Smith & Polk, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiffs, the Chicago Plastering Institute (the Institute), and the trustees of several pension and health and welfare trust funds,[1] have brought this suit against the William A. Duguid Company (Duguid), alleging that Duguid has sought to avoid its obligation to make contributions to their funds as required by its collective bargaining agreements with the Journeyman Plasterers' Protective and Benevolent Society of Chicago, Local 5 (Local 5), and the Inter-

---

1. The plaintiff funds represented by their trustees include the Chicago Plastering Institute Pension Trust Fund; the Chicago Plastering Institute Health and Welfare Trust Fund; the Ma- sons' Health and Welfare Fund, Local 56, DuPage County, Illinois; and the Masons' and Plasterers' Pension Fund, Local 56, DuPage County.

national Union of Bricklayers and Allied Craftsmen, Local 56 (Local 56) and Local 74 (Local 74), by diverting plastering work to one of its foremen, Marvin Borecky, who does business as C & K Plastering (C & K). The plaintiffs have filed a motion for partial summary judgment on the issue of Duguid's liability for its actions from 1986 to 1988. Duguid has filed a cross-motion for summary judgment. For the reasons stated herein, this court denies plaintiffs' motion and grants that of Duguid.

## BACKGROUND

The following facts, and any inferences to be drawn from them, are uncontested. Duguid is in the business of plastering, lathing, drywall, acoustical tile installation, exterior insulation, and prefabricated exterior plastering. It performs both commercial and residential jobs for general contractors, building owners, architects, and individuals throughout metropolitan Chicago. Duguid has employed approximately 90 to 120 employees each year from 1986 to 1988; on the average, it will employ 25 plasterers at any given time, although this number fluctuates with the season. The crew for each Duguid job is designated by executive vice-president Harold Duguid, job superintendent Don Hermle, president William Duguid, or Matthew Duguid.

All of the plasterers hired by Duguid are members of Locals 5, 56, and 74. Duguid has signed collective bargaining agreements with Locals 5 and 56. Pursuant to these collective agreements and the trust agreements they incorporate, Duguid is required to make contributions to those locals' health and welfare and pension funds on a monthly basis, for each hour worked by each covered plasterer. The Local 5 and Local 56 funds have entered into reciprocity agreements with the Local 74 health and welfare and pension funds, un-

der which contributions made by employers on behalf of each plasterer are directed to the fund or funds in which the plasterer is a participant.

Duguid has employed Marvin Borecky as a plasterer foreman for approximately twenty years. Although Borecky supervises Duguid plastering crews, he is a "working foreman" who works alongside his crews as a journeyman plasterer. Because much plastering work is performed outside, the work is seasonal. Borecky works for Duguid from approximately March through early November, Monday through Friday, from 8:00 a.m. to 4:30 p.m. He has been employed by other contractors as well.

Seeking to supplement his income, Borecky formed C & K, of which he is the owner and sole proprietor, in 1974. A smaller enterprise than Duguid, C & K performs plastering work on both commercial and residential properties. Most of its jobs are performed either on Borecky's off-hours (evenings and weekends) or during the off-season (December through February). C & K performs its off-season jobs during regular business hours.

Contending that Duguid has deliberately diverted work to C & K since 1986 to reduce the amount of contributions it owes the health and welfare and pension funds, the plaintiffs filed the instant action under Section 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132, and Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), to recover the allegedly delinquent contributions.[2] Alleging that over three-quarters of C & K's business is obtained from Duguid, the plaintiffs assert that the two companies are alter egos or a single employer or, alternatively, that Duguid has subcontracted work to C & K in violation of its collective agreements with

**2.** Duguid contends that the Chicago Plastering Institute has no standing under ERISA § 502, 29 U.S.C. § 1132(a), a contention that the plaintiffs do not contest. Although not an ERISA fiduciary, the Institute has standing to sue under LMRA § 301, 29 U.S.C. § 185(a), as a beneficiary of the collective bargaining agreements authorizing it to collect contributions. *See Carpenters Local Union No. 1846, etc. v. Pratt–*

*Farnsworth,* 690 F.2d 489, 501 (5th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). *Cf. Bugher v. Feightner,* 722 F.2d 1356 (7th Cir.1983), *cert. denied,* 469 U.S. 822, 105 S.Ct. 98, 83 L.Ed.2d 43 (1984) (passage of ERISA expanded, rather than limited, standing for plaintiffs claiming pension fund violations, which originally was premised on LMRA § 301).

the Locals. The plaintiffs have filed a motion for partial summary judgment on the issue of Duguid's liability from 1986 to 1988.[3] Duguid has filed a cross-motion for summary judgment.

## ANALYSIS

### I. *Summary Judgment Standard*

Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Schroeder v. Copley Newspaper*, 879 F.2d 266, 268 (7th Cir.1989). The movant bears the burden of specifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R. Civ.P. 56(c)). In response, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e). Summary judgment motions must be considered in light of both the applicable substantive law and the question of whether a reasonable jury could render a verdict in the non-movant's favor on that basis. *Checkers, Simon & Rosner v. Lurie Corp.*, 864 F.2d 1338, 1344 (7th Cir. 1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That the parties have filed cross-motions for summary judgment does not mean that genuine issues of material fact necessarily do not exist.

### II. *The Duguid/C & K Relationship*

#### A. C & K as the Alter Ego of Duguid

 The alter ego doctrine deems two nominally distinct businesses to be one in order to prevent an employer from avoiding obligations under a collective bargain-

ing agreement merely by altering its corporate form. *NLRB v. Dane County Dairy*, 795 F.2d 1313, 1321 (7th Cir.1986). While used most commonly to root out " 'a disguised continuance of a former business entity,' " *International Union of Operating Engineers, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir.1987) (quoting *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 24 (1st Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983)), the doctrine is equally applicable to situations in which the entity allegedly seeking to avoid its obligations exists side-by-side with its alleged alter ego. *See Central States, Southeast & Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593 (7th Cir.1990); *Crest Tankers, Inc. v. National Maritime Union*, 796 F.2d 234 (8th Cir.1986).

The alter ego analysis is heavily fact-laden. Alter egos generally are found where two enterprises share "substantially identical management, business purpose, operation, equipment, customers, and supervision as well as ownership." *Crawford Door Sales Co., Inc. and Cordes Door Co., Inc.*, 226 NLRB 1144 (1976). While most of these factors are not individually dispositive, the Seventh Circuit considers unlawful motive or intent to avoid collective bargaining agreement obligations to be critical elements of the inquiry. *Centor Contractors*, 831 F.2d at 1312 (quoting *Penntech Papers*, 706 F.2d at 24).

Neither the plaintiffs nor Duguid dispute that C & K has done plastering jobs as a subcontractor for Duguid on a regular basis since 1986. The basic dispute this court is asked to resolve is one of characterization: whether C & K worked for Duguid as a bona fide subcontractor, or whether C & K was merely a disguised version of Duguid's "after-hours" crew. Although the facts alleged by both sides appear at first glance to be sharply contested, analysis of the parties' 12($l$) and 12(m) statements reveals virtually all of the material facts to be essentially undisputed. In many instances where Duguid has denied

---

**3.** Although plaintiffs pursuing the alter ego theory of liability typically seek to recover from the

alleged alter ego, the trustees have elected to pursue their claim against Duguid alone.

an allegation of fact as stated by the plaintiffs, the plaintiffs have themselves admitted Duguid's allegation to the contrary. The majority of "disputes" between the parties are not of fact but of characterization; where genuine issues of fact exist, they are largely immaterial.[4]

### 1. *Duguid's Intent in Subcontracting to C & K*

Emphasizing that overtime work is compensated at premiums as high as double pay under Duguid's collective bargaining agreements, the plaintiffs on several occasions characterize C & K as Duguid's "after-hours" crew, apparently claiming that Duguid diverted work to C & K in order to avoid paying these overtime premiums. They contend that Duguid can avoid the payment of union rates and overtime premiums by diverting the work, thus ensuring itself a wide profit margin (Pl.Mem. at 7–8 and n. 8).

Even if true, these allegations fail to address the kind of intent relevant to the plaintiffs' alter ego claim. A desire to avoid having to pay overtime premiums is not probative of whether Duguid sought to avoid the obligation to make a set contribution to the plaintiffs' trust funds for each hour worked by a Duguid plasterer. To the extent that not having to contribute to the trust funds was another result of giving portions of Duguid jobs to C & K, the plaintiffs have provided no direct evidence that such was Duguid's underlying motivation. In the absence of direct evidence, therefore, we look to the remaining factors of the alter ego analysis to determine whether the plaintiffs have demonstrated

the requisite intent via circumstantial evidence.

### 2. *C & K as a Sham Entity*

Borecky formed C & K on his own in 1974 as a sole proprietorship, to do side work when he was not working for other plasterers. It is undisputed that Duguid did not even know C & K existed until 1986, when Borecky approached William Duguid to inquire whether he had any extra work that could be subcontracted to C & K (Def.Ex. 1 at ¶¶ 19, 22). Dryvit, a new and relatively inexpensive plastering material, was gaining popularity at the time. The resulting increase in business left Duguid with a labor shortage (Def.Ex. 2 at ¶ 8).[5] According to Duguid, the unions, particularly Local 5, were unable to furnish a consistent supply of qualified plasterers during this busy period. William Duguid began calling Local 5 almost daily to find plasterers, speaking with its secretary and business representatives. Each time, he claims, he was told that no plasterers were available; those who were either were unfamiliar with Duguid's work or had proved inadequate in the past (Def.Ex. 1 at ¶ 21; Pl.Ex. 8 at 228–31).[6] It was at this time that Duguid first subcontracted work to C & K (Def.Ex. 2 at ¶ 8). Despite this factual background, the substance of which the they have failed to controvert, the plaintiffs contend that Duguid seized what it perceived to be an opportunity to transform C & K into its alter ego, in order to avoid paying contributions to the plaintiffs' trust funds.

---

4. Allegations set forth in the parties' respective 12(1) statements shall be referred to as "Pl. Facts" and "Def. Facts." Exhibits submitted in support of the parties' summary judgment motions shall be referred to as "Pl.Ex." and "Def. Ex."

5. According to Duguid, a number of plasterers in the area began to subcontract out jobs or certain portions of jobs (Def.Ex. 2 at ¶ 8). The plaintiffs, however, deny this assertion of fact on the grounds that it is hearsay and irrelevant. It is neither. As a longtime plasterer, Borecky is competent to testify that subcontracting became a prevalent practice in the trade, a fact that reasonably may be expected to fall within

his personal knowledge and, furthermore, will aid this court in assessing the legitimacy of the business relationship between Duguid and C & K.

6. The plaintiffs deny this factual assertion on grounds of hearsay and relevance as well. That Duguid called Local 5 officials on a regular basis to find plasterers is not hearsay; it is a matter within William and Harold Duguid's personal knowledge. That they were told no plasterers were available is offered, not for the truth of the matter asserted, but as evidence of Duguid's motive in subcontracting work to C & K. This assertion, moreover, is quite relevant to this court's analysis.

In contending that C & K is a "sham" entity, the plaintiffs allege that C & K has no business office or business telephone (Pl. Fact 29), that Borecky does most of C & K's bookkeeping and pays its workers (Pl. Facts 31, 40, 45), that C & K does not actively solicit or advertise for the plastering jobs it obtains (Pl. Fact 32), and that it fails to adhere to certain corporate formalities, such as filing of tax returns, withholding federal income tax and FICA from the paychecks of its employees, and carrying workers compensation insurance (Pl. Facts 32, 51, 54, 55). Plaintiffs further allege that C & K depends primarily on Duguid for its income, having obtained at least 78% of its 1987 revenues from Duguid (Pl.Mem. at 4, n. 5). Despite these allegations, an examination of the summary judgment evidence before the court indicates that the plaintiffs have submitted no evidence of a sham transfer of assets from Duguid to C & K; nor have they managed to controvert the substance of the evidence set forth by Duguid in support of its own summary judgment motion.

The facts alleged by both sides confirm that Borecky has run C & K as a relatively informal enterprise. C & K's business office is Borecky's home; his home telephone is C & K's (Pl.Ex. 7 at 21, 30). Although he began by using his personal bank account to handle C & K's financial matters, Borecky opened a checking account for C & K with $5,000 of his own money in 1986

(Def.Ex. 2 at ¶¶ 10–11). Borecky has been the sole capital contributor to C & K (Def.Ex. 1 at ¶ 22; Def. Ex. 2 at ¶¶ 10–11).

The plaintiffs allege that C & K does not advertise for work (Pl. Fact 32). Denying this allegation, Duguid responds that C & K advertises by word of mouth and distribution of business cards, and ran an ad in a suburban newspaper in the early 1980s, only to withdraw it when it produced more work than C & K could handle (Def. Facts 35–36). While refusing to characterize C & K's actions as "advertising," the plaintiffs admit Duguid's contrary allegations and offer nothing to controvert Duguid's evidence that C & K has received regular referrals from a number of contractors and businesses (Def.Ex. 1 at ¶ 13; Def.Ex. 2 at ¶ 20).[7]

Without Duguid, the plaintiffs allege, C & K would be nothing more than a "one-man operation." Citing Borecky's 1987 tax return, which indicates that over 78% of C & K's income for that year came from jobs done for Duguid, the plaintiffs contend that Duguid's work has comprised an overwhelming share of C & K's revenue since 1986 (Pl.Mem. at 4, n. 5). While not denying the contents of the 1987 return, Duguid sharply contests plaintiffs' characterization. In support of its own motion, Duguid presents uncontested evidence, *see supra* note 7, to support its allegation that C & K has performed plastering work for

7. In support of its referral allegation, Duguid offers Borecky's affidavit, which lists a number of contractors who have referred work to C & K (Def.Ex. 1 at ¶ 13; Def.Ex. 2 at ¶ 20). The plaintiffs contend that, unsupported by independent evidence, this "self-serving" affidavit is insufficient to support Duguid's allegation. This affidavit, as well as the others submitted by Duguid, clearly establish that each affiant was competent and possessed personal knowledge of his statements. Beyond this, Fed.R.Civ.P. 56(e) requires only that "[s]worn or certified copies of all papers or parts referred to in an affidavit shall be attached thereto or served therewith." Independent evidence is required only where documents are referred to in the affidavit. *See American Home Assur. Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg*, 625 F.Supp. 1052 (N.D.Ill.1985); *F & J Enterprises, Inc. v. Columbia Broadcasting Systems, Inc.*, 373 F.Supp. 292, 299 (N.D.Ohio 1974).

The plaintiffs raise this objection as their sole response to a number of Duguid's 12(1) statements; with a few noted exceptions, therefore, they have failed to satisfy their obligation as nonmovants with regard to Duguid's cross-motion for summary judgment to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The plaintiffs also repeatedly object to statements in the Borecky and Duguid affidavits referring to trade practice on the grounds of hearsay and Duguid's failure to provide independent evidence of the practice in the trade beyond these "self-serving" sworn statements. As persons experienced in the plastering trade, a fact the plaintiffs do not dispute, Borecky and the Duguids are competent to attest to common practices in the trade. These trade practices, which the plaintiffs do not controvert in substance, are essential to this court's assessment of the nature of the relationship between Duguid and C & K.

over 60 contractors and owners besides Duguid over the last five years (Def.Ex. 2 at ¶¶ 21–22).

The plaintiffs next allege that C & K has never had workers compensation insurance of its own; rather, Duguid's compensation policy covered all plasterers who ostensibly worked for C & K on Duguid's jobs (Pl. Facts 51–53; Pl.Ex. 7 at 23, 110, 115; Pl.Ex. 8 at 198). Acknowledging that its own policy would have covered C & K when C & K's workers compensation insurance was inadequate, Duguid responds that C & K has maintained its own workers compensation policy since 1989 and previously possessed liability insurance that covered plasterers in its employ in the event of injury (Def.Ex. 1 at ¶ 28; Def.Ex. 2 at ¶¶ 46–48). Duguid has failed to attach copies of these policies to Borecky's affidavit, leaving this allegation unsubstantiated under Fed.R.Civ.P. 56(e). Regardless of whether and when C & K purchased workers compensation coverage of its own, however, that it was covered by Duguid's policy when doing work for Duguid—as *any* subcontractor with inadequate coverage apparently would have been—provides little support for the plaintiffs' characterization of C & K as a sham.

The plaintiffs also allege that C & K has failed to comply with basic taxation requirements, including filing of state unemployment compensation tax returns and withholding of federal income and social security taxes (Pl.Ex. 7 at 24). Duguid responds that C & K, on the advice of its accountant, does not withhold income or social security tax or file state unemployment compensation taxes because it is a small business with a constantly changing payroll. As such, C & K opts out of the requirement of filing quarterly returns; instead, it files yearly, sending 1099 forms to those plasterers who have earned over $500 from it each year (Def.Ex. 2 at ¶¶ 12–14). Duguid has failed to attach to Borecky's affidavit copies of the annual tax returns it claims to have filed, arguably leaving this allegation unsubstantiated under Fed.R. Civ.P. 56(e) as well.

Aside from two arguable issues of fact,[8] the plaintiffs present little or no evidence to support their contention that C & K is a sham. Duguid, however, presents undisputed evidence indicating that, while Borecky may have run C & K on a relatively informal basis, it was, in fact, a legitimate enterprise. Contrary to the plaintiffs' contention, the facts offered by Duguid, while perhaps not individually dispositive, are not "minor and irrelevant" (Pl. Reply Mem. at 7). Taken as a whole, they are precisely the sort of facts relevant to an alter ego analysis. See *Kenton Transfer Co.*, 289 NLRB No. 61 (1990) (two new companies held not the alter ego of a third, unionized company, in part because they were run from the owner's home rather than the unionized company's facilities); *Central States*, 902 F.2d at 595 (entities had separate phone numbers and billing operations, but kept close financial ties; obtained joint loans and filed joint financial statements); *Crest Tankers*, 796 F.2d at 236 (preexisting company held to have been turned into an alter ego; the alter ego, however, had been bought and was being run by the same holding company that owned the other two entities in question); *Beer, Soft Drinks, Water, Carbonic Gas & Liquor Sales Drivers, etc., Local No. 744, etc. v. Vierk Corp.*, 549 F.Supp. 393, 397 n. 2 (N.D.Ill. 1982) (separate bank accounts and accounting systems, while relevant, were not dispositive where they were the only factors indicating separation; the entities shared common management, offices, warehouses, supervisors, and staff).

### 3. Common Management and Supervision

In determining whether two ostensibly separate entities share common management, the Seventh Circuit and the National Labor Relations Board emphasize common control over hiring and firing of employees as well as other daily management decisions. See *NLRB v. Emsing's Supermar-*

---

8. Whether C & K complied with state and federal tax filing requirements and whether and when it purchased its own workers compensa- tion insurance instead of permitting itself to be covered under the policies of those for whom it did work.

*ket, Inc.,* 872 F.2d 1279 (7th Cir.1989); *Hageman Underground Construction, et al.,* 253 NLRB 60 (1980).

The plaintiffs allege that once Duguid obtains a plastering job from one of its customers, it determines unilaterally whether to assign that job to its own workforce or to C & K (Pl. Fact 24). As Duguid's foreman, they contend, Borecky supervises a day crew for Duguid; as C & K, however Borecky continues to supervise Duguid's "after-hours" and "weekend" crews—disguised as C & K employees (Pl. Facts 13, 37). Regardless of whether Borecky is supervising a Duguid crew or a C & K crew, the plaintiffs allege, he is supervising the same men in the same manner and reporting to the same management (Pl. Facts 14, 15).

Flatly denying these allegations as mischaracterizations of fact, Duguid responds that the plaintiffs have produced no evidence that the management of Duguid and C & K is jointly controlled. It is undisputed that Duguid management makes all decisions about which plasterers Duguid will hire and which individuals it will assign to its jobs. Duguid, moreover, hires only union plasterers. On the other hand, Duguid contends, Borecky hires plasterers and laborers for C & K on a job-by-job basis, often hiring friends, neighbors, family, and even his daughters' boyfriends (Def.Ex. 2 at ¶¶ 27, 32). The plaintiffs provide no evidence to controvert that submitted by Duguid in this regard.

Duguid disputes as well the plaintiffs' contention that it unilaterally "assigns" projects to C & K. Duguid contends that it

has subcontracted plastering work to C & K on an oral bid basis, typically when Duguid could not obtain other qualified plasterers or when time constraints made it more feasible to subcontract work in order to meet the customers' needs (Def.Ex. 1 at ¶ 23; Def.Ex. 2 at ¶¶ 24–26). This arrangement, Duguid asserts, was not unique; it has had oral subcontracting arrangements with a number of other plastering subcontractors (Def.Ex. 1 at ¶ 24). Review of the evidence before the court indicates no support in the record for the plaintiffs' allegation; conversely, Duguid's allegations are supported by the record and not controverted in substance by the plaintiffs. *See supra* note 7.

Noting that Borecky hires a number of plasterers from Duguid worksites, the plaintiffs contend that Borecky never reveals to these plasterers that it is C & K performing the work rather than Duguid (Pl. Fact 39). Duguid does not deny that Borecky has hired plasterers for C & K from other contractors' jobsites when Borecky was also working on those sites, but responds that Borecky explains to those individuals whom he hires that they will be performing a side job for which C & K is responsible (Def.Ex. 2 at ¶¶ 28, 30, 34). Plasterers, Duguid insists, routinely accept side jobs in order to supplement their income (*Id.*). A review of the summary judgment evidence reveals no support in the record for the plaintiffs' allegations; the plaintiffs, moreover, have failed to submit any evidence controverting Duguid's summary judgment evidence, as required by Rule 56(e). *See supra* note 7.[9]

---

**9.** In support of their allegation that Borecky "never reveals" to the plasterers he hires that they will be working for C & K, the plaintiffs cite to one page from the depositions of three Duguid plasterers who performed side jobs for C & K (Pl.Ex. 41 at 11; Pl.Ex. 42 at 7; Pl.Ex. 43 at 25). The pages cited contain testimony that is ambiguous at best; review of the totality of the deposition excerpts, moreover, makes clear that these plasterers knew that Borecky was C & K, and that C & K was not Duguid.

For example, the plaintiffs cite the testimony of Brunette Green that Borecky asked him if he wanted to help Borecky do "a side job for Duguid" (Pl.Ex. 41 at 11); Green testified later in his deposition that he and other plasterers pre-

ferred to work for Borecky because he would pay them more up front than Duguid, which withheld federal income and FICA taxes (Pl.Ex. 41 at 23–26). The plaintiffs cite the testimony of Juan Gean that Borecky asked him if he would do a patch job (Pl.Ex. 42 at 7); one page later, Gean also testified that "I knew who [Borecky] was, C & K." (Pl.Ex. 42 at 8). Finally, the plaintiffs cite the deposition of James McFredries, who testified that Borecky asked him after work if he would help him with some small jobs on weekday evenings (Pl. 43 at 25); one page later McFredries indicates that he and Borecky would hire each other to work on side jobs they each had obtained (Pl.Ex. 43 at 26). Clearly, these plasterers knew the difference be-

Finally, the plaintiffs contend that Borecky has admitted to taking his instructions from Duguid when working as C & K; review of the summary judgment evidence, however, reveals the plaintiffs' claims to be exaggerated. Duguid admits that Don Hermle visits each jobsite, or at least attempts to, at least once during every job. As Duguid points out, however, Hermle normally oversees *all* Duguid jobs, particularly those which have been subcontracted, because Duguid, like any contractor, is responsible for ensuring that all work performed by its employees or subcontractors conforms to customers' expectations (Def.Ex. 1 at ¶ 25; Def.Ex. 2 at ¶¶ 29, 39). According to the affidavit of William Duguid, beyond providing initial explanation of the work to be done, Duguid personnel do not manage or supervise C & K's work or that of other subcontractors on a daily basis. As C & K, Borecky avers, he supervises his own employees (Def.Ex. 2 at ¶¶ 29, 39). Although they deny these last allegations, the plaintiffs supply no evidence to controvert these affidavit statements. *See supra* note 7.

The evidence before the court provides no support for the plaintiffs' contention that Duguid manages and/or supervises C & K's plasterers as it does its own. Their own allegations lacking support in the summary judgment record, the plaintiffs have failed as well to controvert the substance of the affidavits put forth by Duguid, which would indicate no more supervision than that involved in a typical contractor situation. The undisputed facts indicate nothing that would distinguish the Duguid/C & K relationship from a typical subcontracting relationship.

### 4. *Same Business Purpose*

Plaintiffs contend that, as enterprises engaged in plastering, both Duguid and C & K have the same business purpose (Pl. Facts 3, 10, 11). Duguid responds that, beyond the fact that both entities engage in plastering, the scope of their respective enterprises indicates the divergence in their business purposes. Duguid is a multifaceted plastering company that is hired to work on large commercial and residential projects and employs a full complement of support personnel. In addition to the work done by its own plasterers, Duguid also subcontracts small repair jobs or "extras" requested by customers, a practice common in the construction industry (Def.Ex. 1 at ¶ 14). Duguid's evidence is not controverted in substance. *See supra* note 7.

In contrast, Duguid asserts, C & K is a sole proprietorship performing primarily small residential jobs and small commercial repair jobs as a subcontractor to larger entities (Def.Ex. 2 at ¶ 3). It does not maintain a steady payroll and typically employs no more than three plasterers at a time, including Borecky. Because Borecky established C & K to supplement his full-time job income, C & K operates on a part-time basis only, during Borecky's off-hours or during the off-season (Def.Ex. 2 at ¶¶ 5, 6, 19).

Far from "trivial," as the plaintiffs assert, these differences in the character of the two enterprises indicate that Duguid and C & K serve different functions in the plastering trade. *See Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1337 (9th Cir.1988) (non-alter ego finding supported by fact that one company builds major block walls for housing tracts and the other builds small block walls and chainlink fences for individual private residences); *Kenton Transfer Co.*, 298 NLRB No. 61 (1990) (non-alter ego finding supported where companies all were engaged in trucking, but one's business was primarily intrastate and that of the other two was 90 percent interstate).

### 5. *Substantially Identical Business Operations*

As construed by both the National Labor Relations Board and the Seventh Circuit, this prong of the alter ego analysis inquires whether one company is dependent upon the other for financial support, whether they share the same facilities, and whether they function jointly on a daily basis. *See Central States Pension Fund*

tween working for Duguid and working for

Borecky/C & K.

*v. Sloan,* 902 F.2d at 597–98; *Hageman Underground Construction,* 253 NLRB 60 (1980).

As set forth earlier in this opinion, the plaintiffs have submitted no evidence that would indicate that C & K is financially supported by Duguid or that Duguid and C & K share the same facilities. As the record before this court unambiguously indicates, C & K's only business office is in Borecky's home; its business number is Borecky's home phone number. It is undisputed as well that the two entities run distinct financial operations; Borecky, with occasional paid help from his daughters, maintains his own financial records for C & K (Def.Ex. 2, ¶¶ 16, 17).

The plaintiffs thus attempt to prove an identity of operations between Duguid and C & K by alleging that the two function jointly on a daily basis. They contend that Duguid operates C & K in the same manner that it runs its own business, except that C & K is Duguid's "after-hours" crew. According to the plaintiffs, Duguid assigns Borecky jobs to be completed by C & K on evenings and weekends (Pl.Ex. 7 at 42). Borecky and his plasterers then perform these jobs during off-hours on the same jobsite that they work during the week for Duguid (Pl. Facts 58–83). When the job is done, Borecky pays his C & K crew members during the regular workweek on the Duguid jobsite and invoices Duguid for the labor costs (Pl.Ex. 7 at 22, 43).

The plaintiffs by and large restate assertions previously found to be without support in the summary judgment record. *See supra* Section I.B.3. At the outset, their characterization of C & K as nothing more than Duguid's "after-hours" crew ignores two facts that are undisputed in substance: that C & K operates only when Borecky is not working his full-time job (not only evenings and weekends, but regular business hours during the off-season), and that C & K has not worked exclusively for Duguid (Def.Ex. 2 at ¶¶ 5, 6, 19, 21, 22). *See supra* note 7. As previously held, the plaintiffs' allegation that Duguid "assigns" work to

Borecky is without support in the record as well. Moreover, while the plaintiffs' additional allegation that C & K plasterers work at the same jobsites for C & K that they work as Duguid plasterers during the week is undisputed, it adds nothing to their contention that C & K and Duguid are identical operations. This situation is consistent with a legitimate subcontracting relationship. *See Florida Marble Polishers Health and Welfare Trust Fund v. Edwin M. Green, Inc.,* 653 F.2d 972, 974 (5th Cir.1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2235, 72 L.Ed.2d 846 (1983) (no integrated relationship where two ostensibly separate entities worked at the same jobsite only when one subcontracted work to the other).

Finally, despite their assertion that Borecky pays C & K plasterers at the Duguid jobsite during the regular workweek, the plaintiffs themselves admit Duguid's clarification of this fact: that Borecky has "only distributed C & K paychecks at contractors' jobsites if he was working at the site and if the individuals he had previously employed were then employed by the contractor and were working at the same site" (Def. Fact 53; Def.Ex. 2 at ¶ 31).

### 6. *Shared Equipment and Materials*

The plaintiffs contend that C & K uses Duguid's equipment and supplies to perform virtually all of its jobs (Pl. Fact 42). At the crux of their contention is their allegation that the Dryvit that C & K uses for Duguid jobs either belongs to or is paid for by Duguid. It is undisputed that C & K uses materials left by Duguid at a jobsite, takes the Dryvit from Duguid's warehouse, or purchases the material itself and charges Duguid (Pl.Ex. 7 at 66–67, 115; Pl.Ex. 8 at 84). When C & K uses Duguid's Dryvit on jobs it performs for Duguid, its invoice is adjusted downward from its original estimate, which includes both labor and materials, and Duguid is charged for labor only; when C & K orders its own materials, it invoices Duguid for both materials and labor (Def.Ex. 2 at ¶¶ 42–44).[10]

---

**10.** It also is undisputed that C & K uses Duguid scaffolding when working on jobs obtained from Duguid. (Pl.Ex. 7 at 115–16). Borecky has testified, however, that scaffolding was of-

Despite the breadth of the plaintiffs' allegations, the evidence before the court falls far short of demonstrating that C & K is, in substance, dependent upon Duguid for the materials it needs to operate its business. The plaintiffs' own exhibits belie their blanket assertion that C & K uses Duguid's materials on "virtually all" of its jobs. The plaintiffs have made detailed allegations concerning 26 jobs done by C & K, 25 of which were undisputedly obtained from Duguid (Pl. Facts 58–83).[11] The evidence before this court indicates that C & K used Duguid material, invoicing Duguid for labor alone, on fewer than half of these jobs: Connie's Pizza in Bloomingdale (Pl.Ex. 11(b)); Dominick's at Route 83 (Pl.Ex. 7 at 91); Handy Andy at Route 83 (Pl.Ex. 7 at 91); The Shopping Center at 95th and Jeffrey (Pl.Ex. 8 at 135–36);[12] Old Orchard Office Center (Pl.Ex. 24(b)); Park and Shop (Pl.Ex. 8 at 168); Taco Bell in Aurora (Pl.Ex. 8 at 188); Dominick's at Naperville Road (Pl.Ex. 7 at 194–95); Dominick's at 127th and Ridgeland (Pl.Ex. 33(d)); and Lombard Shopping Center (Pl.Ex. 34(b) and (c)). The plaintiffs' own evidence indicates that C & K purchased its own materials for the remaining jobs and invoiced Duguid accordingly.[13]

Duguid's evidence indicates, moreover, that the practices that the plaintiffs cite to prove C & K's status as Duguid's alter ego are typical in the trade. According to the affidavits of Borecky and Harold Duguid, which the plaintiffs fail to dispute in substance, *see supra* note 7, plastering subcontractors that purchase their own materials commonly charge general contractors for them; on smaller patching and repair jobs, subcontractors commonly use "overage"— material left over at the jobsite—or material in the general contractor's stock (Def.Ex. 1 at ¶ 26; Def.Ex. 2 at ¶ 43). As a general contractor, Duguid charges its own customers for its labor and material costs (Pl. Facts 6–8); that C & K, in turn, charges Duguid for the materials it uses,

---

ten present when jobs began, and was then used by all of the trades working on the job, not simply by C & K (Pl.Ex. 7 at 116).

11. It is unclear whether Duguid or C & K was responsible for plastering work done under contract for the Bartwood Funeral Home, owned by Jon Martin, a close friend of Harold Duguid (Pl.Ex. 7 at 187; Pl.Ex. 8 at 194). Duguid provided Martin with an estimate (Pl.Ex. 8 at 223–26), which proved to be too high. C & K actually did the work for less, apparently under direct contract with Martin, whom it invoiced directly (Pl.Ex. 32(b)—(d)). Duguid apparently gave Borecky time off to perform the work and provided the materials as well (Pl.Ex. 7 at 185–87). Far from indicating intent to avoid its obligations to the plaintiffs' trust funds, however, the plaintiffs' summary judgment evidence indicates that Harold Duguid was motivated by a desire to help out an old friend. According to Borecky's deposition testimony,

> Yeah, [Martin] was [Harold Duguid's] friend. They've been friends for a long time and asked me if I wouldn't mind doing this; and I asked some guys and said I'd pay them if you want to work for us. So we worked a weekend—we worked solid on it to get it done and we went right back on the payroll. That's the only time I can recall I [was] pulled off [Duguid's] payroll.

Pl.Ex. 7 at 187.

12. Whether C & K used Duguid overage on this job is a disputed issue of fact. Despite Harold Duguid's deposition testimony to the contrary, C & K invoiced Duguid for both materials and labor on this job (Pl.Ex. 22(b)).

13. With regard to five of the remaining 17 jobs indisputably performed by C & K for Duguid, the plaintiffs' allegations that C & K used Duguid materials are unsupported by their citations to the record; other portions of plaintiffs' own evidence, moreover, indicates that C & K purchased its own materials, invoicing Duguid accordingly: Deerfield Executive Center (Pl.Ex. 8 at 129, Pl.Ex. 12(b) and (c)); Deerfield Executive House (Pl.Ex. 7 at 106, Pl.Ex. 13(a) and (b)); Liberty National Bank (Pl.Ex. 7 at 98, Pl.Ex. 16(a) and (b)); Riverside Square Shopping Plaza (Pl.Ex. 27(a) and (b)); McMahon's Restaurant (Pl.Ex. 29(a), (b), (c), (d) and (e)).

With regard to eight jobs, the plaintiffs do not allege that C & K used Duguid materials and their own exhibits indicate that C & K purchased its own materials: Mundelein Shopping Center (Pl.Ex. 9(c), Pl.Fact 58); Suburban Bank of Elmhurst (Pl.Ex. 17(c), Pl. Fact 66); BMW of Naperville (Pl.Ex. 18(a) and (b), Pl.Fact 67); Michael Reese Hospital in Orland Park (Pl.Ex. 19(b) and (c), Pl.Fact 68); Zelda's Restaurant (Pl.Ex. 20(b), Pl.Fact 69); Hampton Inn (Pl.Ex. 21(b), Pl.Fact 70); Depot Shopping Center (Pl.Ex. 23(a), Pl.Fact 72); Riverfront Shopping Center/Handy Andy (Pl.Ex. 28(b), Pl.Fact 77).

With regard to one job, Carpetland, the plaintiffs allege that C & K used Duguid materials but provide no citation to the record; their own exhibits indicate that C & K purchased its own materials (Pl.Ex. 10(a), Pl.Fact 59(f)).

either directly for those materials it purchases or indirectly by using Duguid's overage, provides little support, if any, for the claim that C & K is Duguid's alter ego. There is no indication in the record that Duguid has the right to exercise any control over the sources to which C & K looks for the materials of its trade. *See Better Building Supply Corp.*, 259 NLRB 469, 476 (1981).

### 7. *Same Customers*

While acknowledging that C & K acquires residential jobs on its own, the plaintiffs contend that C & K's commercial customers are substantially the same as Duguid's, thus evidencing the alter ego nature of the relationship between the two (Pl. Facts 58–83). According to the plaintiffs, Duguid enters into an agreement with a customer to perform a job, a portion or the whole of which it then assigns to C & K.[14] Duguid represents to the customer that it will perform the job and ensures that the work is completed to the customer's satisfaction. C & K never bills the customer directly; instead, C & K bills Duguid, which, in turn, bills the customer (Pl. Facts 27, 33, 46–48, 58–83). This arrangement, the plaintiffs assert, enables Duguid and C & K to engage in a "clandestine sharing" of customers.

Review of the summary judgment evidence reveals plaintiffs' theory to be without merit. As set forth earlier in this opinion, the plaintiffs have failed to controvert in substance Duguid's assertion that approximately 60% of C & K's business involves individual residential clients (Def.Ex. 2 at ¶ 3). *See supra* note 7. When C & K does perform commercial work, the jobs it obtains are generally small repair and finishing work and are referred to C & K on a regular basis from contractors and businesses besides Duguid (Def.Ex. 2 at ¶ 20; Def.Ex. 1 at ¶ 13).

To the extent that C & K works on jobs obtained from Duguid, the plaintiffs' characterization of the Duguid/C & K relationship as a "clandestine sharing of custom-

ers" borders on the ridiculous. The structure of the contracting relationship between Duguid, its customers, and C & K, and the fact that both Duguid and C & K stood to profit from their relationship, evidences nothing more sinister than a typical contractor/subcontractor relationship.

### 8. *Common Ownership*

The plaintiffs concede that neither the Duguid Company nor any of the Duguids have ever owned any financial interest in C & K. As a trustee of the Local 5 Health and Welfare Fund, they allege, William Duguid was "too smart to directly own a financial interest in C & K," opting instead to become a "silent partner" with his "trusted employee," Borecky (Pl.Mem. at 11). Unsupported by any material facts, these contentions are without merit. In the absence of some evidence of actual common ownership, the plaintiffs have failed to satisfy this factor in the alter ego analysis.

### 9. *Conclusion*

This court has engaged in an exhaustive review of the summary judgment evidence submitted by both sides to this litigation. Although some of the evidence presented by the plaintiffs may, if stretched, be said to support their theory that C & K is Duguid's alter ego, or at least present a genuine issue of fact, much of their own evidence belies their allegations, particularly with regard to intent, the critical element of the inquiry. No rational trier of fact could conclude that C & K is the alter ego of Duguid in light of the overwhelming undisputed evidence offered by Duguid to the contrary. *See Central States*, 902 F.2d at 598. There being no genuine issue remaining for trial on the plaintiffs' alter ego theory, Duguid is entitled to summary judgment on this ground.

### B. Duguid and C & K as a Single Employer

■ Similar to the alter ego theory, the single-employer doctrine treats two os-

---

**14.** As previously held, there is no support in the summary judgment record for plaintiffs' assertion that Duguid "assigns" jobs to C & K. Rath-

er, C & K submits an oral bid on those jobs it wishes to perform.

tensibly unintegrated companies as a single employer where the facts reveal them to "comprise an integrated enterprise." *Esmark, Inc. v. NLRB*, 887 F.2d 739, 753 (7th Cir.1989); *Emsing's Supermarket*, 872 F.2d at 1288–89.[15] Four basic factors are considered in a single-employer analysis: interrelated operations, common management, centralized control of labor relations, and common ownership. No one factor is dispositive. *See Iowa Express Distribution, Inc. v. NLRB*, 739 F.2d 1305, 1310 (8th Cir.), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984). Having provided little evidence, if any, regarding common ownership, common management and identity of operations in support of their alter ego claim, the plaintiffs' sole hope here is to demonstrate a genuine issue as to whether Duguid and C & K share centralized control of labor relations.

The plaintiffs contend that the centralization of labor relations between Duguid and C & K can be seen in the fact that most of the plasterers hired by Borecky for C & K jobs are Duguid employees. According to the plaintiffs, Duguid controls all terms and conditions of employment with C & K.

These contentions are without merit. While a number of the plasterers Borecky hires for C & K jobs have worked for Duguid, the plaintiffs themselves admit that they were hired because Borecky had become familiar with their work and their personalities as a result of his job as a Duguid foreman (Def.Ex. 2 at ¶ 37). Moreover, Duguid presents uncontroverted evidence, *see supra* note 7, demonstrating that a number of plasterers who have worked for Duguid were hired by Borecky

to work for C & K on non-Duguid jobs (Def.Ex. 2 at ¶ 35), and that a number of individuals who have worked for C & K were never employed by Duguid at all (Pl.Ex. 1 at ¶ 46; Pl.Ex. 2 at ¶ 38). Finally, the plaintiffs present no evidence to support their claim that Duguid controls the terms and conditions of plasterers' employment with C & K.

Under the totality of the circumstances, the plaintiffs have failed to demonstrate the existence of any genuine issue as to whether Duguid and C & K are a single employer. *See Emsing's Supermarket, Inc.*, 872 F.2d at 1288–89; *Esmark*, 887 F.2d at 753. Summary judgment is granted to Duguid on this basis as well.

III. *Subcontracting to C & K as a Breach of Duguid's Collective Bargaining Agreement*

■ This court has found no genuine issue of material fact as to whether Duguid and C & K were alter egos or a single employer; the undisputed evidence makes clear, as Duguid has contended, that the relationship between the two entities was one of contractor and subcontractor. Neither ERISA nor federal labor law prohibits subcontracting, even though it avoids overtime obligations to the contractor's employees, unless a collective bargaining contract restricts the practice.

Even in the absence of an alter ego or single-employer finding, the plaintiffs contend that this relationship violated Duguid's collective bargaining agreements with Locals 5 and 56, thus entitling them to compensatory damages in the form of the contributions they lost. *See Carpenters*

---

**15.** While alter ego analysis is intended to determine whether a non-signatory to a collective agreement is bound by its terms, single-employer analysis determines whether two entities are "so related that they should be treated as one employer *for purposes of collective bargaining.*" *Centor Contractors*, 831 F.2d at 1313 n. 2 (emphasis added). An alter ego finding binds a nonsignatory to a collective bargaining agreement, but a single-employer finding in and of itself will not. *See Pratt–Farnsworth*, 690 F.2d at 508 n. 7; *Penntech Papers*, 706 F.2d at 24; *Naccarato Construction Co.*, 233 NLRB 1394, 1398 (1977). A number of courts, including this one, have nonetheless permitted plaintiffs to use

single-employer doctrine in LMRA § 301 and ERISA § 502 actions to analyze what entity constitutes the "employer" for purposes of breach of a collective bargaining agreement. *See Pratt–Farnsworth*, 690 F.2d at 505; *Metropolitan Detroit Bricklayers Dist. Council, etc. v. J.E. Hoetger & Co.*, 672 F.2d 580, 584–85 (6th Cir.1982); *International Brotherhood of Electrical Workers v. Namco Electric, Inc.*, 653 F.2d 143, 146–47 (5th Cir.1981); *Russom v. Sears, Roebuck and Co.*, 558 F.2d 439 (8th Cir.), *cert. denied*, 434 U.S. 955, 98 S.Ct. 481, 54 L.Ed.2d 313 (1977); *Railroad Maintenance Laborers' Local 1274 Pension, Welfare and Education Funds v. Kelly R.R. Contractors, Inc.*, 591 F.Supp. 889 (N.D.Ill.1984).

*and Millwrights Health Ben. Trust Fund v. Gardineer Dry Walling Co.*, 573 F.2d 1172, 1176 (10th Cir.1978); *Kelly R.R. Contractors*, 591 F.Supp. at 892.

The plaintiffs contend that by subcontracting work to C & K Duguid violated a number of provisions in the Local 5 collective agreement. Among these are the requirements that Duguid perform all plastering work through its own company and not through any entity in which it has a financial or proprietary interest (Pl.Ex. 3, Art. VIII(a)) [16], that Duguid contract only with entities that are "fair" to the union (Pl.Ex. 3, Art. IX(a)), that only plasterers qualified by the Local 5 examining board may work as a contractor in Local 5's jurisdiction (Pl.Ex. 3, Art. XIV), that Duguid notify the union of all employment opportunities (Pl.Ex. 3, Art. II), and that contractors not set up their employees as subcontractors of labor alone (Pl.Ex. 3, Art. XII). The plaintiffs contend that the Local 56 collective agreement contains similar restrictions.[17]

Duguid responds that the only arguable restriction on its right to subcontract may be found in Article VIII of the Local 5 collective agreement, which it contends provides in relevant part that a signatory contractor will be bound by the terms of the agreement if it performs plastering work by or through any other entity in which the contractor has a financial or proprietary interest (Pl.Ex. 3, Art. VIII). Because the undisputed evidence indicates that Duguid has no financial or proprietary interest in C & K, however, Duguid asserts that this provision is inapplicable in the instant case. Barring application of Article VIII, Duguid contends, it is entitled to summary judgment.

Neither the collective bargaining agreements on which the plaintiffs sue nor the trust agreements under which they are authorized to do so require that the plaintiffs first submit their subcontracting claim to arbitration. *See Pipe Fitters' Welfare Fund, Local Union 597 v. Mosbeck Industrial Equipment, Inc.*, 856 F.2d 837 (7th Cir.1988). Like an arbitrator, however, a court asked to interpret a collective bargaining agreement in the first instance must take care to fill in the interstices of that agreement in light of the bargaining history and past practices of the parties.

Having focused their efforts primarily on the alter ego and single-employer issues, neither the plaintiffs nor Duguid have provided the full analysis and background necessary to enable this court to rule on the subcontracting issue at this time. While Article VIII of the Local 5 agreement arguably could be read in its broadest sense as a subcontracting ban, for example, neither side addresses, and the agreement does not seem to indicate, what Duguid's rights were to be in the event of a shortage of qualified labor—a situation which Duguid has undisputedly averred existed as of 1986. Moreover, while the Local 56 collective bargaining agreement contains, as the plaintiffs contend, similar provisions, these provisions seem to be less comprehensive than those in the Local 5 agreement. These points of difficulty are not exclusive. Rather, they are indicative of the barriers that prevent this court from granting summary judgment at this time to either the plaintiffs or Duguid as to the validity under the Local 5 and 56 agreements of Duguid's actions in subcontracting its plastering work to C & K.

## CONCLUSION

Duguid's motion for summary judgment is granted with regard to the plaintiffs'

---

16. These are the plaintiffs' constructions of the collective bargaining agreement provisions cited. That we have set these constructions out should not be taken as an indication of this court's acceptance of their validity.

17. The plaintiffs also contend that subcontracting work to C & K constituted a violation of Duguid's obligations to its customers, a contention Duguid vehemently denies. These contentions, however, are irrelevant. Whether sub-

contracting is a common practice in the industry and whether Duguid's decision to subcontract work to C & K was in compliance with its customer agreements, as Duguid alleges, is irrelevant to whether the subcontracting that occurred was in violation of the collective agreements by which Duguid was bound and of which the plaintiffs' trust funds were beneficiaries.

claim that Duguid and C & K are alter egos or a single employer, and is denied with regard to the plaintiffs' alternative claim that Duguid subcontracted plastering work to C & K in violation of its collective agreements with Locals 5 and 56. The plaintiffs' motion for partial summary judgment is denied in its entirety.