**ARCHITECTURAL IRON WORKERS LOCAL NO. 63 WELFARE FUND, et al., Plaintiffs,**

v.

**UNITED CONTRACTORS, INC., and United Skys, Inc., Defendants.**

No. 96 C 3860.

United States District Court, N.D. Illinois, Eastern Division.

March 9, 1999.

Bernard M. Baum, Alan H. Auerbach, Catherine Marie Chapman, Stephen Jay Rosenblat, Laura M. Finnegan, Elizabeth Ann LaRose, Baum, Sigman, Auerbach, Pierson & Neuman, Chicago, IL, for plaintiffs.

Daniel V. Kinsella, Rooks, Pitts & Poust, Chicago, IL, David Matthew Rownd, Burditt & Rudzius, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

GUZMAN, United State Magistrate Judge.

Pending are the parties cross motions for summary judgment pursuant to F.R.Civ.P. 56(c). Also pending is defendants' motion to strike certain of plaintiffs' summary judgment exhibits and a number of plaintiffs' 12(M) statements. For the reasons set forth below, defendants' motion to strike is granted in part and denied in part. Plaintiff's motion for summary judgment is denied and defendant Skys' motion for summary judgment is granted.

## MOTION TO STRIKE

Before ruling on the merits of the parties' motions for summary judgment, the arguments raised in defendants' motion to strike must be addressed. In general, defendants' motion to strike claims that many of the exhibits offered by plaintiffs in support of their motion for summary judgment are unsupported by affidavit or testimony of record and/or otherwise fails to meet the evidentiary standards required on summary judgment. In other instances, defendants complain that though a document may have been used during a deposition, the testimony regarding the document is not sufficient to render it admissible on summary judgment. Defendants finally claim that many of the inferences which plaintiffs have set forth in their 12(M) statement either do not cite admissible evidence or are unfounded because of the breadth of the inferences drawn in comparison to the actual evidence of record.

Plaintiffs object to defendants' filing of this motion to strike arguing that this motion was unnecessary and improper. Plaintiffs argue that defendants could have easily set forth their evidentiary objections to plaintiffs' proffered evidence in their response to plaintiffs' 12(M) statement. We find that defendants' motion is a proper method for resolving the issues that

defendants complain of. *FDIC v. Meyer, 781 F.2d 1260, 1268 (7th Cir.1986).* However, the motion to strike will be granted only if the complained of materials are essentially unsupported by the record, it is not the function of a motion to strike to resolve conflicting evidence in the record.

Defendants' first argument is that plaintiff's Exhibits/Tabs 2, 3, 10, 11, 13, 16, 23, 24, 25, 26, 27, 28, 29, 32, 33, 34 (pages 9–47), 35, 38, 45, 46, 49, 50 (D and F) are inadmissable because they are unsupported by affidavit or deposition testimony. These documents are as follows:

Tab 2　Excerpts from the collective bargaining agreement with Local 63.

Tab 3　Excerpts for the collective bargaining agreement with Local 393.

Tab 10　A fringe benefit contribution report filed by Contractors for work performed in January, 1993.

Tab 11　A time card for employee Vogelsang for week ending January 8, 1993.

Tab 13　Various dispatch papers kept by the Union showing dates on which Contractors called the Local 63 hiring hall for employees.

Tab 16　A table showing the officers and directors of United Skys from 1993–1997.

Tab 27　A table showing the employees of United Contractors and United Skys and the sources of that information.

Tab 18　Lists of United Skys' employees for year ending 1993.

Tab 19　Lists of United Skys' employees for year ending 1994.

Tab 20　Lists of United Skys' employees for year ending 1995.

Tab 21　Lists of United Skys' employees for year ending 1996.

Tab 23　Lists of United Contractors employees for year ending 1993.

Tab 24　Lists of United Contractors employees for year ending 1994.

Tab 25　Lists of United Contractors employees for year ending 1995.

Tab 26　Lists of United Contractors employees for year ending 1996.

Tab 28　Reports sent by United Contractors to Local 8 of the Ironworkers for fringe benefit contributions.

Tab 29　An invoice from Local 8 of the Ironworkers Fringe Benefit Funds to United Contractors for liquidated damages and interest.

Tab 30　Two vehicle titles showing the owners as United Skys and United Contractors.

Tab 32　A memorandum of action of shareholders and directors of United Skys and United Skys Board of Directors meeting minutes, December 1993 through December 1996.

Tab 33　Two consent actions of directors of United Contractors, Inc. one date December 1993 and one dated November 1994.

Tab 34　Pages 9 through 47 are various subcontracts between United Skys and general contractors for the installation and manufacture of skylights.

Tab 35　Purchase orders issued by United Skys to United Contractors for 1994.

Tab 37　A page of the workers compensation insurance policy issue to United Skys and United Contractors.

Tab 38　Copies of checks payable to United Contractors from United Skys for the period January 1993 through May 1997.

Tab 45　A letter from Jerry Johnson of United Skys to Jim Morton of Local 63.

Tab 46　Yellow Pages listing for "skylights" in the far northern suburban area of Chicago.

Tab 49　Various time cards for employee Aaron Kozak.

Tab 50　Four time card on which the name at the top in United Contractors with the word "Contractors" being crossed out and the words "Skys" handwritten above it.

Tab D　An October 24, 1995 letter form Charles McCartney as president of United Skys to Laura Finnegan on United Contractors' stationary.

Tab F　An invoice form United Skys to Laura Finnegan at the firm of Baum, Sigman, Auerbach, Pierson & Neuman, Ltd. for the cost to produce United Contractors' general ledger.

Plaintiffs point out that twenty of the exhibits listed above, the documents

under Tabs 11, 18, 19, 20, 21, 23, 24, 25, 26, 28, 29, 30, 32, 33, 34, 35, 37, 38, 49, and 50 were all produced during the course of the litigation in response to Plaintiffs' requests for documents. The case law is this circuit is clear: documents produced in response to discovery are self-authenticating. *South Central Bank v. Citicorp Credit Services*, 863 F.Supp. 635, 645 (N.D.Ill.1994). Further, there is no error to admit as evidence documents that Defendants themselves possess and produced in response to Plaintiff's requests for production of documents. *United States v. Brown*, 688 F.2d 1112 (7th Cir.1982).

In addition to being self-authenticating, the documents produced by Defendants contain Defendants' own statements and are admissions, not hearsay. Under Federal Rule of Evidence 801(d)(2), admissions by party opponents are not hearsay. A statement or document is an admission under the Federal Rules of Evidence if it is offered against a party and is the party's own statement in either an individual or a representative capacity or a statement by a person authorized by the party to make a statement concerning the subject. Statements under the Federal Rules of Evidence included both oral and written assertions. F.R.Evid. 801(a). Therefore, defendants' motion to strike these documents is denied.

Defendants also attempt to strike Exhibits 2 and 3 because they were not produced by Plaintiffs during discovery but rather before discovery commenced. These exhibits contain excerpts from the parties collective bargaining agreements. The language in these excerpts have not changed with subsequent collective bargaining agreements and defendants do not argue that any of the terms are no longer binding. Because defendants have admitted they are parties to the collective bargaining agreements and because they do not dispute that any of these terms are no longer binding defendants' motion to strike Exhibits 2 and 3 is denied.

Defendants also complain about Exhibits 10 (Union Contribution Report) and 45 (Letter from Jerry L. Johnson of United Skys to James Morton of the Ironworkers Local 63). These are both documents prepared by defendants. Defendants do not deny that they sent the contribution report and letter to plaintiffs. There is no allegation that the documents are forgeries or that they have been tampered with. Indeed, if this were so, defendant's, as the authors of the documents, could easily controvert the documents and ask that they be stricken. Instead, defendants merely state that there is no independent authentication. Because the defendants could so easily call into question the accuracy or authenticity of these documents if they wished to do so, we find little danger to the truth finding process in allowing them to be used by plaintiffs. Thus, the motion to strike is denied.

The "requisition forms" at Exhibit 13 have been authenticated and are admissible. These are the "dispatch papers" written by the union when Contractors and/or Skys called for workers and were retrieved from the union's files. Defendants' counsel deposed Mr. Christos, Local 63's business agent, and at pages 16 through 27 of the deposition transcript, defendants' counsel went through each page that plaintiffs attached under Tab 13. Thus, these forms have been authenticated and are admissible.

Exhibits 16 and 27 are inadmissible for purposes of this motion because plaintiffs have failed to lay a proper foundation for its admission. Table 2, under Exhibit 27, is a summary and comparison of lists of employees of Contractors, list of employees of Skys and a summary of employees who were paid expenses and payroll checks from Contractors as based on Contractors' cash disbursement journals. Table 1, under Exhibit 16, is a comparison of the officers and directors of United Skys from 1993 through 1997. This evidence was apparently produced in the defen-

dants' Annual Reports to the State of Illinois.

Federal Rule of Evidence 1006 provides that summaries are admissible evidence where they offer the only practicable means of making voluminous records available to the judge. However, defendants are correct in their argument that a proper foundation has not yet been established as to these tables. Therefore, this Court finds these Exhibits inadmissible under Federal Rule of Evidence 1006 for purposes of this motion only. Defendants' objection to the documents contained in Exhibit 46, the Donnelly Telephone Directory pages is overruled. These are self-authenticating records under the Federal Rules of Evidence 902(6). Thus, Exhibits 2, 3, 10, 11, 13, 18, 19, 20, 21, 23, 24, 25, 28, 29, 30, 32, 33, 34 (pages 4–7), 35, 37, 38, 45, 46, 49, 50 (D & F) are admissible and defendants' motion to strike paragraphs 2–5, 15, 16, 19–26, 28–31, 45, 49, 53, 57, 60, 62, 63, 66–67, 69 (second sentences), 70–71, 74, 76, 82–85, 90, 92 (third sentence to end), 93 (first two sentences), 96, 99, 101, 108–110, and the third sentences of 112–115 are denied.

Defendants finally argue that paragraphs 12, 15–16, 33 (second sentence), 33, 46–47, 50–51, 54–55, 58–59, 61 (second sentence), 64 (last sentence), 65, 68–69 (second that third sentences), 70 (first sentence), 75, 76 (first sentence), 78(last sentence), 80, 86, 88, 91 (first sentence), 95, 101, 107, 112 (first and fourth sentences), 113 (fourth sentence), 114 (first and fourth sentences) and 115 (first and fourth sentences) of plaintiffs 12(M) statement should be stricken.

With respect to paragraph 12 defendants' motion to strike is denied. The date of Contractors and Skys incorporation is clearly July 12, 1988 and October 9, 1986 respectively but it is undisputed that Mr. McCartney make the relevant statement under oath. With respect to paragraph 15 defendants motion to strike is denied. Although the cited deposition testimony of Jean Dawson does not completely support this assertion of fact, Exhibit 10—the contribution report does. With respect to the second sentence of paragraph 16 the motion to strike is denied because Exhibit 13 supports this assertion of fact. Paragraph 33 (second sentence) of plaintiff's 12(M) statement is stricken because it misstates what Paul Matik testified to during his deposition. Paragraphs 41 and 61 (second sentences) will not be stricken because they are supported by the deposition testimony of Heinrikson Paragraph 42 is stricken because this statement is not supported by Heinrikson's deposition testimony. Paragraphs 46, 47, 50, 51, 54, 55, 58, and 59 are all admissible because these facts are reflected on the face of the defendants' own documents.

Paragraph 64 (last sentence) is stricken because it mischaracterizes the testimony of McCartney. Paragraph 65 is admissible because McCartney's testimony supports this assertion of fact. Paragraphs 68–69 (second and third sentences), and 70 (first sentence), 75, 76 (first sentence),78 (last sentence) and 107 are all stricken because these statements of fact mischaracterize what McCartney testified to in his deposition.

Paragraphs 80 and 91 (first sentence) are admissible because they are supported by the record while paragraphs 86 and 88 are stricken because they call for a conclusion with respect to disputed facts. Paragraphs 95, 101, 112 (first sentence) are admitted because they are supported by the record. Paragraphs 112 (fourth sentence), 113 (fourth sentence), 114 (first sentence) and 115 (first sentence) are admitted pursuant to the stipulation of the parties with the phrase "for services rendered" added. Paragraph 115 (fourth sentence) is admitted because this assertion is supported by the face of the cash disbursement journal. Therefore, for the reasons listed above defendants motion to strike is denied in part and granted in part.

Finally, this Court strikes the second sentence in paragraph 2 of plaintiffs 12(N)

because it calls for a legal conclusion; ¶ 60 b of plaintiffs 12(N) because it is redundant; paragraph 8 of plaintiff's 12(N) because it is disputed; paragraph 10 calls for conclusions and is disputed; paragraph 11 calls for conclusions of the disputed facts that Skys was not subcontracting its work to Contractors but rather "assigning" it; paragraph 19 of plaintiffs 12(N) because this is a disputed issue of fact; paragraph 54 (last two sentences) calls for legal conclusion; paragraph 58–63 of plaintiffs 12(N) because they are redundant, paragraph 17, 18 of plaintiffs 12(N) because it is redundant calls for conclusion of disputed facts and so based upon information and belief; because they are redundant for purposes of Rule 12. The documents they rely upon are certainly admissible but for purposes of establishing the undisputed material facts of this case this Court does not have to keep repeating facts already cited by the parties.

### BACKGROUND FACTS

The background facts are taken from taken from the parties 12(M) and (N) statements pursuant to Local Rule 12. Plaintiffs Architectural Iron Workers Local No. 63 Welfare Fund, Iron Workers' Mid–America Pension Plan, Iron Workers' Tri–State Welfare Plan, Architectural Iron Workers Local No. 63 Defined Contribution Fund, Architectural Metal Trainee School Local No. 63, Iron Workers Local 63 Savings Plan, Iron Industry Promotion Fund, Architectural and Ornamental Iron Workers Local No. 63 AFL—CIO, initiated this suit in the United States District Court for the Northern District of Illinois. The plaintiffs allege in their complaint that defendant, United Skys, Inc. (Skys) is the alter ego of defendant, United Contractors, Inc. (Contractors), a wholly owned subsidiary of Skys, and thus responsible for contributions to the funds.

Contractors is an Illinois corporation and is the signatory to the collective bargaining agreement between Contractors and the plaintiffs. Skys is not a signatory to the collective bargaining agreements. The agreements between Contractors and Locals 63 and 393 provides that the employer shall pay contributions to the Iron Workers Tri–State Welfare Plan and the Mid–America Pension Plan for all employees who perform work covered under that agreement. (Plaintiff's 12(M), ¶ 5). This suit seeks to require Skys to comply with the collective bargaining agreements between the plaintiffs and Contractors.

### SKYS AND CONTRACTORS

Skys was established by Charles McCartney in 1986 and was officially incorporated on or around October 9, 1986. (Plaintiffs' 12(M), ¶ 11 and Defendants' 12(M), ¶ 1). Skys' principal place of business is 702 Magna Drive, Round Lake, Illinois. (Plaintiff's 12(M), ¶ 13). Skys is not a union shop and has never been a party to any collective bargaining agreement. (Def.12(M), ¶ 15). Skys commonly abbreviates its name as USI. (Plaintiff's 12(M), ¶ 13).

Skys is a designer, fabricator, and manufacturer of large architectural skylights, atriums, and Glashouse pool enclosures with moveable roofs. (Def.12(m), ¶ 2). Skys sells its Glashouse pool enclosures to distributors around the country. These Glashouse pool enclosures are a standardized product with a fixed pricing schedule (Defendants' 12(M), ¶ 7) and the installation of these pool enclosures is not in issue in this litigation.

Skys is best known for developing complex, state-of-the-art skylight structures, of architectural significance and for improving upon pre-existing engineering standards with respect to existing skylights through the use of new materials and processes. (Defendants' 12(M), ¶ 5). Its "customers" for its custom structural skylights are architects and developers throughout the continental United States. Skys architectural skylight work involves designing, engineering, and manufacturing a custom product, so most of its sales with respect to this custom product result from

a competitive bidding process. (Defendants' 12(M), ¶ 8).

Skys employs engineers, who design and engineer the skylights; sales personnel, who pursue sales leads and negotiate new projects; and estimators, who develop bids with the assistance of the engineers. (Defendants' 12(M), ¶ 39). These employees work primarily out of Skys' production facility in Round Lake, Illinois, but on occasion travel to job sites around the country to supervise and monitor the progress of the installation projects. (Id).

Skys also employs production employees which include fabricators, finishers and assistants. (Defendants 12(M), ¶ 40). These employees work exclusively at Skys' production facility in Round Lake, Illinois and it is undisputed that these production employees do not travel and do not perform installation work. (Id). Skys also employs administrative employees including an office manager, Candice Heinrikson and Paul Matik, an accountant. (Defendants' 12(M), ¶ 41).

Most bid solicitations for custom structural skylights requires a proposed design and cost estimate which includes estimates for design, engineering, fabricating, manufacturing work and installation. (Defendants' 12(M), ¶ 9). Plaintiffs claim that estimates for the installation portion of these custom skylights is not necessarily required but defendants dispute this assertion arguing that Skys is ultimately responsible for proper installation of the skylights. (Defendants' 12(M), ¶ 42).

When Skys is approached by a customer (usually a General Contractor) for a bid for one of its custom skylights Charles McCartney, Skys' president, and Hans Abramat, one of Skys directors, would review the bid documents received from its customers. (Plaintiffs' 12(M), ¶ 70). Abramat would then generate an estimate to complete the work which includes engineering, manufacturing, and installation. (Id). McCartney would review the estimate generated by Abramat with respect to the installation aspect and, depending on how it looked, would approve it for Contractors. (Id). McCartney would review the Skys estimate and ultimately Skys would bid a lump sum to provide materials and/or labor. (Id).

Each time Skys was awarded a skylight design and fabrication project, its Project Manager, Engineering Manager, Plant Manager and other engineers would meet to discuss the project approach, resources and budget. The engineer assigned to the project would prepare a preliminary design under the supervision of the Engineering Manager. A structural engineer would then review the preliminary design and engage in considerable consultation with materials vendors to determine the content, strength and flexibility of the vendors' products in varying sizes, under varying temperatures and when used in combination with different materials. They would also test different combinations of materials to prove that the preliminary design will perform properly and may make modifications in the design or materials as a result. Skys would then review the recommendations of its employees as well as the proposed design and on occasion would suggest additional modifications before the final design was submitted to the requesting architect. This "design and engineering process" required hundred of hours of work and culminates in precise materials specifications and drawings of each pane of glass and silicon, each piece of steel, aluminum or plastic, and each screw, clamp, or bead of caulk. (Defendants' 12(M), ¶ 13).

Once Skys' designs are approved by the requesting architect, Skys' Materials Manager arranges for the purchase and delivery of the necessary materials to Skys' facility. After the materials are received and allocated by the Materials Manager, Skys' Plant Manager establishes a production schedule and the material received goes into "fabrication." Skys' fabrication engineers develop the precise geometry of the structure, cutting lengths, quantities

and connections to enable the shop fabricators to start assembling the base product. The fabricators punch, drill, and cut aluminum extrusions. Once the extrusions are complete, Skys' finisher effectively smooths the edges of the base product to ensure that connections and interfaces are sound. A Skys' engineer, manager, and superintendent then review the product, process and proposed application. If the product meets specifications, it is shipped or otherwise delivered to the work site (Defendants' 12(M), ¶ 14) and is now ready for installation.

What happens after this product is delivered to the work site and is ready for installation is at the heart of this litigation and calls into question the role of Skys superintendents. Plaintiffs maintain, that Skys used its superintendents to perform the required installation of its custom skylights to the exclusion of union workers. (Defendants' 12(M), ¶ 50, Plaintiff' ¶ 71). In particular, plaintiffs' claim that Skys had installation contracts with Flower City, Architectural Metals, Mellon Stuart MKK, Morse Diesel, George Hyman and Walter Josylyn and for these contracts Skys performed the installation. Skys denies that it did the installation on these projects arguing that it subcontracted the installation work to its wholly owned subsidiary Contractors. Contractors offers its corresponding purchase orders from Skys to Contractors which memorialize Contractors agreement to handle the installation work on these projects. (Defendants' ¶¶ 69 and 117).

Contractors was incorporated by Skys as a wholly owned subsidiary to perform construction site skylight installation on or around July 12, 1988. (Plaintiffs' 12(N), ¶ 16 & 17). Contractors President is also Charles R. McCartney. (Plaintiffs' 12(M), ¶ 6). McCartney testified in his deposition that Contractors was established within a year of the establishment of Skys (Plaintiffs' 12(M), ¶ 12) and was started for the purpose of installing steel and glass windows manufactured by Skys. (Plaintiffs'

12(M), ¶ 9). It is disputed whether Contractors performed installation work for any other manufacturer of skylights other than Skys. (Defendants' 12(N), ¶ 68).

Contractors' "offices" consists of rented trailers stationed at each job site but it is undisputed that Contractors principal place of business, as a matter of law, is 702 Magna Drive, Round Lake, Illinois. Its telephone number is the same as Skys (847) 546–7776. (Plaintiffs' 12(M), ¶ 7). (Defendants' 12(M), ¶ 25, Plaintiff's 12(M), ¶ 7, and Plaintiffs' 12(N), ¶ 25). The trailers typically contain a desk, a phone, a fan, tools and small equipment.(Plaintiffs' 12(N), ¶ 25). Contractors owns small tools, and its expenditures for the purchase of the tools are reflected on its cash disbursement journal, frequently with a notation like "tools" listed next to the payee. (Plaintiffs' 12(N), ¶ 26). Contractors' commonly abbreviates its name as UCI. (Plaintiff's 12(M), ¶ 8).

Because Skys' work is not limited to any geographic area Contractors does not invest in costly capital expenditures with respect to the equipment required to do the installation but instead rents such equipment from local suppliers at a given job site. (Defendants' 12(M), ¶ 22). Examples of the types of equipment rented by Contractors include trailers, scaffolding, man lifts, welding equipment and cranes and representative entries from Contractors' cash disbursement journals reflects certain equipment rental expenditures. (Plaintiffs' 12(N), ¶¶ 23 & 24.)

According to defendants when an installation project was awarded by Skys to Contractors, the subcontract is memorialized by a purchase order reflecting the date of Skys' order, the location of the job and a description of the work to be provided by Contractors. (Defendants' 12(M), ¶ 51). It is undisputed that nobody would sign the purchase orders on behalf of Contractors because Contractors automatically accepted the purchase order as the wholly-owned subsidiary of Skys. (Plaintiffs' 12(M), ¶ 71).

The purchase orders between Skys and Contractors do not provide for progress payments. The form subcontracts between Skys and the other installation companies do provide for progress payments. (Plaintiffs' 12(M), ¶ 76). Paul Matik testified in his deposition that when he worked for Turner Construction, the practice was usually that a subcontractor had to submit a sworn statement that labor and supplies had been paid to receive progress payments. (Id). Although Matik testified such a sworn statement was required in Illinois, he could not say whether Contractors ever submitted sworn statements to receive progress payments from Skys. (Id). In his experience with Turner it was unusual for progress payments to be once a week. (Id).

The progress payments that Skys makes to Contractors are much smaller than those Skys normally makes to outside subcontractors but are made more frequently. Skys has made small frequent progress payments to Contractors because it monitors Contractors' cash flow. Skys has a legitimate interest in keeping Contractors' cash flow positive so that Contractors can meet its obligations to others (including laborers) and thus continue its installation work. (Defendants' 12(N)(3)(b), ¶ 120). Skys makes progress payments to Contractors without fear that Contractors would take the money and fail to complete the installation project. (Defendants' 12(N)(3)(b), ¶ 121).

According to defendants, because Skys was ultimately contractually responsible for installation of the custom skylights (Defendants' 12(M), ¶ 42) Skys employed superintendents who, through coordinated meetings with Skys' engineering and production staff, became thoroughly familiar with the engineering, process and materials specifications for each custom project. (Id). This specialized knowledge allows Skys' superintendents to oversee the installation of the custom product (Id). It is disputed whether these superintendents are common in the industry and whether they were in fact performing installation work. (Plaintiffs' 12(N), ¶ 42).

In addition to their meeting with Skys' engineers and production employees, Skys' superintendents regularly traveled to construction sites where installation of Skys' products is being performed by a subcontractor, whether the subcontractor is Contractors, or any other contractor and whether the construction site is in the Chicago-area, or located in some other state. (Defendants' 12(M), ¶ 43). McCartney testified that in the last two years of operations, Skys received bids from installations subcontractors other than Contractors. (Defendants 12(N), ¶ 72).

When Contractors was awarded installation work it was Skys' superintendents such as Morman, Donat and Vogelsang who would hire the necessary laborers from the appropriate local union hiring halls.(Id). At the job sites, Skys' superintendents review specifications, monitor the general progress of the work and other correction if specifications are not being met or if the materials used are not performing consistently with prior test results. (Id.). To accomplish these assessments, they used measuring devices and ladders owned by Skys which they transport to the site in trucks owned by Skys.

The following individuals were at one time employed by Skys as superintendents: Steven Mars, Paul Mormon, Jack Donat, Aaron Kozak, Jeff Popalorum, Don Palma, Brad Banks and Terry McCartney. (Defendants' 12(M), ¶ 44). Donat, Populorum, Marrs, Morman, and Palma all originally worked for Contractors on job sites and were initially hired out of the union hall. Each one was offered a position as superintendent for Skys. They agreed and started to work for Skys. They worked at job sites on behalf of Skys around the country. After working as superintendents and traveling extensively, each one left Skys and returned to installation work. It is disputed whether Contractors made all of the required contributions when these employees were first hired out of the

union hall and it is disputed whether contributions were made once they assumed their positions of superintendent for Skys. (Defendants' 12(N)(3)(b) ¶ 125; Plaintiffs' Response ¶ 125). Plaintiffs claim that according to the affidavit of David J. Jensen contributions were never received for these employees. A review of Contractors cash disbursement journals reveals that some contributions were in fact made on behalf of Mars and Moorman. Al Pierce was also a Sky's employee who worked in the field. (Plaintiffs' 12(M), ¶ 41). Plaintiffs' maintain that these superintendents performed the installation work. (Plaintiff's Response to Defendants' 12(N)(3)(b) ¶ 125). It is disputed, whether in their work for Contractors they had any supervisory authority over the employees. (Defendants' 12(N), (3)(b) ¶ 125).

Skys' currently has only one superintendent, Michael Vogelsang. (Id.) It is disputed whether Vogelsang was only employed by Skys since 1988 (Plaintiff's 12(M), ¶ 15) because Vogelsang was reported to the Funds for work performed in January, 1993, as an employee of Contractors. (Plaintiff's 12(N), ¶ 44). The job of Michael Vogelsang is to ensure that United Skys' product is installed correctly so that United Skys does not incur liability under its contract with the general contractor. (Defendants' 12(N),(3)(b) ¶ 126). Before Vogelsang worked for Skys he was employed by Turner Construction. It is disputed whether Vogelsang's job position is common in the industry of architectural skylight design and manufacture. (Defendants' 12(N)(3)(b) ¶ 128).

Vogelsang regularly travels to construction sites where the installation of Skys' product is being performed by a subcontractor, whether it is Contractors or another sub-contractor, and whether the site is in the Chicago area or out of state. (Defendants' 12(N)(3)(b) ¶ 131). Vogelsang's job duties included meeting with Skys' engineers, management, and production employees each time the plans for a new project are developed. Because the designers and engineers may require new materials or processes for a given job, participating in the meeting allows Vogelsang to build his base of experience in the industry and gain specific familiarity with the engineering, process, and materials specifications for the given project. (Defendants' 12(N)(3)(b) ¶ 129). Vogelsang is able to ensure that the installation work that Skys' subcontracts out is being performed properly by the subcontractor's laborers and that the engineering concerns raised by the interface between Skys' product and the rest of the building are being satisfied (Defendants' 12(N)(3)(b), ¶ 130).

On the jobsite, Vogelsang's activities included monitoring the job progress, ensuring that Skys product is being installed correctly by the subcontractor and in accordance with the job specifications, and consulting with the architects and/or developers (Defendants' 12(N)(3)(b), ¶ 132). Because Skys' products (which can range from skylights, to complex atria) are custom designed and made, every time a new design, material and/or manufacturing technique is used, it affects how the product must be installed. As a result, Vogelsang works closely with the subcontractors' laborers, whether the subcontractor is Contractors or some other subcontractor to instruct the laborers how to work with Skys' product, and, where necessary, demonstrate new techniques to the laborers. Vogelsang also measures Skys' product and checks the integrity of connections and seals (Defendants' 12(N)(3)(b) ¶ 133). It is disputed whether Vogelsang actually installed the custom skylights for the subcontractors. (Defendants' 12(N)(3)(b), ¶ 134). Plaintiffs claim he did.

None of Skys' superintendents had any authority to hire, terminate, or exercise any supervisory authority over any other employee of Skys. (Defendants' 12(M), ¶ 46). Rather Skys' Plant Manager and Skys' President, Charles McCartney, had the authority to supervise the production and engineering staff, (Defendants 12(M),

¶ 47), including but not limited to the authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, discipline, direct or to hear, adjudicate or adjust any complaint or grievance, of Skys' plant manager, superintendent, sales and Administrative Employees. (Defendants' 12(N), ¶ 48).

During the years 1993 through 1997 Skys employed approximately 19 to 39 employees (Exhibits 19 and 19). It is disputed whether Skys' employees work on a permanent, regular basis although it is undisputed that some have been employed by Skys for as long as 12 years. (Defendants' 12(M), ¶ 38, Plaintiff's 12(N), Tabs 5, 6, 7, 8). Plaintiff's allege that in 1993, there were 12 employees who were terminated; some having worked a few months, some having worked a couple of years. (Id.) In 1994, 19 employees were terminated; some having only worked a few months in 1994, some having worked a few years. (Plaintiff's 12(N), tab 6). In 1995, 32 employees were terminated; some having worked a number of years, some having worked a few months. (Plaintiffs 12(N), Tab 7). In 1996, 14 employees were terminated; some having worked a few months, some having worked a number of years. (Plaintiff's 12(N), Tab 8).

Contractors does not employ any management employees because of the sporadic nature of its work. (Defendants' 12(M), ¶ 45). Further, Contractors' employees were hired on a job-by-job basis, not on a permanent basis, in part because Contractors did not always have an installation job to perform, and in part due to the fact that it performs installation work in whatever state the job is located in. (Defendants' 12(M), ¶ 32). These laborers work exclusively at construction job sites installing skylights (Defendants' 12(M), ¶ 34) and the laborers would pick up their paychecks from the trailer which served as Contractors' office at the work site. At no time has McCartney ever hired, transferred, suspended, laid off, recalled, promoted,, assigned, rewarded, discharged, directed, or heard or adjudicated or adjusted any complaint or grievance of, any bargaining unit employee of Contractors. Likewise, at no time has McCartney ever directed Skys' superintendents to take any such action with respect to a bargaining unit employee of Contractors.

Plaintiffs allege that the installers performing the installation work on behalf of Contractors were not always hired from the union hall but were in reality Skys' superintendents and that a comparison of Skys' and Contractors' payroll records establishes that Contractors employed Skys' installers to perform the installation work. (Plaintiffs' 12(M), ¶¶ 38–63). Skys denies that its superintendents were performing installation work and claims that it is not dependent upon Contractors for installation work. (Defendants' 12(M), ¶ 52). In fact, on at least three occasions Skys subcontracted work to other installers. (Plaintiff's 12(M), ¶ 68, Plaintiff's 12(N), Tab 4, pp. 13, 118). Examples of other installation subcontractors hired by Skys in recent years include ABC Erecting, Midwest Erectors and Special P Erectors. (Id.) There are other subcontractors, both in the Chicago area and around the United States, which are in the business of installing skylights and it is undisputed that Skys has subcontracted installation work to entities other than Contractors.

If Skys awards a subcontract for installation work to an outside firm, the award is memorialized by a Standard Form Construction Subcontract published by the Associated General Contractors of America, the America Subcontractors Association, Inc. and the Associated Specialty Contractors, to which minor modification are made, depending on the nature of the particular job. (Defendants 12(N)(3)(b), ¶ 118). It is undisputed that Skys has never required Contractors to execute a Standard Form Construction Contract or to provide the progress payment application or lien waives referenced in Section 14 of the Standard Form Construction Subcontract as it does with outside subcon-

tractors. This is because Contractors is a wholly-owned subsidiary and would not be expected to have any disputes with Skys with respect to its obligations. (Defendants' 12(N)(3)(b), ¶ 119).

## COMMON OFFICERS AND DIRECTORS

For the year ending July 1, 1993, Charles McCartney was the president of Contractors; Paul Matik, Jr. was the Secretary of Contractors; and Charles McCartney was the sole director of Contractors. (Plaintiffs' 12(M), ¶ 19). As of the year ending October 1, 1993 Charles McCartney was the president of Skys, Paul Matik, Jr. was the secretary of Skys as well as the treasurer; and Hans Abramat was the sole director of Skys. (Plaintiffs' 12(M), ¶ 20). .

For the year ending July 1, 1994 Charles McCartney was the president of Contractors; Paul Matik, Jr. was the Secretary of Contractors; and Charles McCartney was the sole director of Contractors. As of the year ending October 1, 1994, Charles McCartney was the president and a director of Skys; Paul Matik, Jr. was the secretary, treasurer and a director of Skys; and Hans Abramat was a director of Skys. (Plaintiffs' 12(M), ¶ 22).

As of the year ending July 1, 1995, Charles McCartney was the president and a director of Contractors; Paul Matik, Jr. was the secretary, treasurer, and a director of Contractors; and, Hans Abramat was a director of Contractors. (Plaintiffs' 12(M), ¶ 23). As of the year ending October 1, 1995, Charles McCartney was the president of Skys; Paul Matik, Jr. was the secretary and treasurer of Skys; and Hans Abramat was the sole director of Skys. (Plaintiffs' 12(m), ¶ 24).

As of the year ending July 1, 1996, Charles McCartney was the president and a director of Contractors; and Paul Matik, Jr. was the secretary and treasurer of Contractors. (Plaintiffs' 12(M), ¶ 25). As of the year ending October 1, 1996, Charles McCartney was the president and

a director of Skys; Paul Matik, Jr. was the secretary, treasurer and a director of Skys; and, Russell Jeschke was a director of Skys. (Plaintiffs' 12(M), ¶ 26).

It is disputed whether an annual report was filed by Contractors for the year ending July 1, 1997. (Plaintiffs' 12(M), ¶ 27). In the year ending October 1, 1997, Skys' president, secretary, treasurer and director was Charles McCartney. (Plaintiffs' 12(M),¶ 28). There were no other officers and directors.

## COMMON MANAGEMENT

Skys' president has always been Charles McCartney. (Plaintiffs' 12(M), ¶ 30). Contractors' president has always been Charles McCartney. McCartney's salary was paid by Skys. (Plaintiffs' 12(M), ¶ 31). Skys' accountant was Paul Matik, Jr. who was also General Counsel for Skys. (Plaintiffs' 12(M), ¶ 32). Contractors' accountant was Paul Matik, Jr. his salary was not paid by a check from Contractors, but by a check from Skys. (Plaintiffs' 12(M), ¶ 33).

Skys' office manager, from 1990–1997, was Candice Heinrikson. Heinrikson was McCartney's assistant and secretary when she first started with Skys in 1990. As office manager, she was assistant to the sales department and the engineering department. She would investigate problems or discrepancies with billing and resolve them. Heinrikson's responsibilities also included ensuring all billings were done completely and correctly on time. She would distribute contracts that would come in on a job, make copies of those contracts and distribute the contracts to McCartney, Matik, and Abramat. When she first started in 1990, she did not have keys to the building, but she did possess keys to the building in the last couple of years of her employment with Skys. (Plaintiffs' 12(M), ¶ 34). Candice Heinrikson would write checks from time to time on Contractors' bank accounts for Contractor's expenses, calculate the payroll and prepare fringe benefit contribution reports

for Contractors' employees. For her services to Contractors, Ms. Heinrikson was paid by Skys. Candice Heinrikson was not an employee of Contractors. (Plaintiffs' 12(M), ¶ 35). McCartney testified that Contractors was getting out of the installation business because it was too difficult to supervise and Contractors was losing money for Skys. (Plaintiffs' 12(M), ¶ 100).

## COMMON EMPLOYEES

In answer to Plaintiffs' first Set of Interrogatories, No. 10, Contractors responded that Marrs, Donat, Morman, Vogelsang and Turnage were at various times Contractors' supervisors, job superintendents, forepersons as well as managerial personnel who at various times had authority to formulate and effectuate some management policies, or to recommend or to exercise discretionary action independently of established policy. (Plaintiffs' 12 (M), ¶ 36). Marrs, Donat, Morman and Vogelsang have all been paid by both Skys and Contractors at various times between January 1993, and December, 1996. (Plaintiffs' 12(M), ¶ 37).

In answer to Plaintiffs' First Set of Interrogatories, No. 9, Contractors responded that Marrs, Donat, Morman, Vogelsang and Turnage were at various times Contractors' supervisors, job superintendents and forepersons. (Plaintiffs' 12(M), ¶ 38). According to Charles McCartney's testimony Marrs, Donat, Morman, Vogelsang, and Banks, Populoram, T. McCartney and Kozak were all employees of Skys, employed at different times between 1993 and 1996 to supervise the installation of skylights by Contractors' employees at the site where the skylights were installed. (Plaintiffs' 12(M), ¶ 39). Skys' payroll lists, for the period of 1993 through 1996, show Marrs, Donat, Morman, Vogelsang, Banks, Populoram, T. McCartney and Kozak under the classification "field". (Plaintiffs' 12(M), ¶ 40). As indicated earlier, Don Palma and Al Pierce were also listed as working in the field.

Plaintiffs' first Set of Interrogatories No. 6, asked Contractors to identify "every person or firm who was employed for the purpose preparing financial, accounting and payroll records and including those persons or firms employed as independent contractors." Contractors responded that those persons included Therese Manuel, payroll clerk, United Contractors, Inc. Paul Matik, Jr. c/o United Contractors and Candice Heinrikson c/o United Contractors, Inc. Neither Manuel, Matik, nor Heinrikson appear on Contractors' pay lists or cash disbursements. (Plaintiffs' 12(N), ¶ 106).

In calendar year 1993 Donat and Populoram received compensation for services rendered from both Skys and Contractors. (Plaintiffs' 12(M), ¶ 43). In calendar year, 1994, Jack Donat received compensation for services rendered from both Skys and Contractors. (Plaintiffs' 12(M), ¶ 43).

Skys' 1993 year end employee lists show Banks, Donat, Maars, T. McCartney, Morman Populoram, Palma, Pierce and Vogelsang as employees. (Plaintiffs' 12(M), ¶ 44). There were also approximately 29 other employees at Skys at this time. (Exhibit 18). Contractors' 1993 payroll lists show Populoram, Donat, Morman, and Palma as employees. (Plaintiffs' 12(M), ¶ 45). There were also approximately 81 other employees employed by Contractors for that year. (Exhibit 23). Contractors 1993 cash disbursement journals show payroll checks made payable to Populoram, Donat, Palma, and Morman. (Plaintiffs' 12(M), ¶ 46). Contractors' 1993 cash disbursement journals show expense/advance checks made payable to Populoram, Vogelsang, Maars, Morman, Donat and T. McCartney. (Plaintiffs' 12(M), ¶ 47). Defendants' stipulated that in calendar year 1993 Jack Donat, Jeff Populoram and David Palma received compensation for services rendered both from Skys and Contractors. In that same year, Skys' payroll records show Banks, Donat, Marrs, T. McCartney, Morman, Populoram and Vogelsang as the "Field employees." In

the same year, Contractors' cash disbursements journals show checks written to Populoram, Donat, Palma and Morman. (Plaintiffs' 12(M), ¶ 112).

Skys' 1994 year end employee lists show Donat, Marrs, T. McCartney, Morman, Populoram, and Vogelsang as employees. (Plaintiff's 12(M), ¶ 48). There were approximately 29 other employees with Skys at this time also. (Exhibit 19). Contractors' 1994 pay lists show Banks, Donat, Populoram, T. McCartney, Morman, Palma, Turnage as employees. (Plaintiffs 12(M), ¶ 49) as well as approximately 100 others. (Exhibits 24) Contractors' 1994 cash disbursement journals show payroll checks were written to Populoram, Marrs, Donat, and Morman with the initials w.e. next to the entry. (Plaintiffs' 12(M), ¶ 50). Contractors' 1994 cash disbursement journals show expense and/or advance checks made payable to Vogelsang, Marrs, Donat, Populoram and Moorman. (Plaintiffs' 12(M), ¶ 51).

Donald Palma was an employee of Skys in 1993 and 1994. (Plaintiffs' 12(M), ¶ 61). Donald Palma was reported to Local 8 of the Iron Workers by Contractors for iron work performed in August, September and October, 1993. (Plaintiffs' 12(M), ¶ 62). Local 8 of the Iron Workers Fringe Benefit Funds sent an invoice to Skys for liquidated damages and interest for late payments of contributions. The invoice was sent to Contractors. In the top right-hand corner is a note written by a Skys or Contractors employee which states "late because Don Palma changed from USI to UCI." At the bottom of the invoice, again written by a Skys or Contractors employee, is a note which states "paid 11–11–93 USI No. 5474." (Plaintiffs' 12(M), ¶ 63).

Skys' 1995 records show Kozak, Morman, Popularam, Vogelsang, T. McCartney, Donat and Marrs as employees (Plaintiffs' 12(M), ¶ 52) as well as others. (Exhibit 20). Contractors' 1995 payroll lists show that Populoram, Donat, and Marrs were on the Contractors' payroll (Plaintiffs' 12(M), ¶ 53) as well as approximately 100 others. (Exhibit 25). Contractors' 1995 cash Journal shows payroll checks written to Popularum, Donat, Morman, Kozak, Marrs. (Plaintiffs' 12(M), ¶ 54). Contractors' 1995 cash disbursement journals show checks made payable to Vogelsang, Morman, Popularam, Kozek, and Donat. (Plaintiffs' 12(M), ¶ 55).

Skys' 1996 records show that Vogelsang, Kozak, Morman and Populoram as employees (Plaintiffs' 12(M), ¶ 56) as well as others. (Exhibit 21). Contractors' 1996 records show that Donat, Marrs, Populoram were on the payroll (Plaintiffs' 12(M), ¶ 57) as well as 75 others. (Exhibit 26). Contractors' 1996 cash disbursement journals show checks made payable to Mars, Vogelsang and Morman. (Plaintiffs' 12(M), ¶¶ 58 & 59). According to defendants', in calendar years 1995, 1996 and 1997 no person received compensation from both Contractors and Skys. (Defendants' Stipulation, Exhibit 22).

### COMMON EQUIPMENT

Two vehicle titles produced by the defendants in discovery show that Skys and Contractors jointly own two vehicles. One vehicle is a Dodge D–150 truck; and, the other vehicle is a Ford F–250 truck. (Plaintiffs' 12(M), ¶ 64). Skys' trucks are used to transport the supervisors and materials to installation sites. (Plaintiffs' 12(M), ¶ 65). Plaintiffs' first Set of Interrogatories No. 7, asked Contractors to identify its owned or leased vehicles. Contractors responded that it did not own or lease vehicles. (Plaintiffs' 12(M), ¶ 102). Contractors' vehicles are used to transport superintendents to the job sites. (Plaintiff's 12(N), ¶ 55). It is also undisputed that Contractors cash disbursement journals shows a substantial number of entries which reveal that Contractors consistently rented equipment, scaffolds, cranes, etc. throughout the course of its operation.

### INTERRELATION OF BUSINESS OPERATIONS

Skys held regular meetings of the board of directors once year. (Plaintiffs' 12(M),

¶ 66). Contractors did not have regular meetings of the board of directors (Plaintiffs' 12(M), ¶ 67). Plaintiffs admit that Contractors' corporate and financial records are maintained by Skys' administrative employees at Skys' facility in Round Lake, Illinois in the ordinary course of business. (Plaintiffs' 12(N), ¶ 29). Skys paid the rent for both its use and Contractors' use of the premises at 702 Magna Drive Round Lake, Illinois. Skys entered into the lease agreement with the landlord of the premises at 702 Magna Drive Round Lake, Illinois. (Plaintiffs' 12(M), ¶ 87). Skys paid for the use of the phone, electricity, and water. (Plaintiffs' 12(M), ¶ 89).

Contractors maintains a separate bank account and cash disbursement journal which reflects expenses such as payroll, equipment rental fees, premiums for workers' compensation premiums, unemployment tax, and pension and welfare contributions pursuant to the collective bargaining agreement. (Defendants' 12(M), ¶ 27). Contractors had separate accounts in states where it does business so that it could pay payroll taxes and insurance to particular state funds. (Defendants' 12(M), ¶ 56).

Paul Matik was the accountant who kept the books and records of Skys and Contractors and testified that gross receipts, sales and use and excise taxes were kept separate, based on the activities of Contractors and Skys, so they were assessed separately. (Defendants' 12(M), ¶ 57). Skys and Contractors had a single joint workers' compensation policy. (Plaintiffs' 12(M), ¶ 73).

Between 1988 and 1995, Contractors and Skys had an oral agreement whereby Contractors would be charged by Skys $3,000 per month in exchange for administrative services which were to be performed by Skys'president, Charles R. McCartney, accountant, Paul Matik, Jr., office manager, Candice Heinrikson and various other administrative personnel. (Defendants' 12(M), ¶ 30). The administrative management fee also included incidental expenses on Contractors' behalf such as office supplies. (Id). These management fees were reflected on both the consolidating schedule for tax returns for Skys and Contractors and on Contractors' general ledger. (Id).

However, in 1995, Skys' President, McCartney determined that it was no longer feasible for Skys to continue to charge the management fee to Contractors. It is disputed why Charles McCartney discontinued this management fee arrangement between Contractors to Skys. McCartney testified that this management fee was discontinued because payments on some of Sky's major contracts were being withheld, while at the same time, continued performance of installation work and modifications were being demanded of Skys. Paul Matik testified that he "became of the opinion that we could no longer figure out what portion-no longer agree to a specific portion of management to charge United Contractors". (Plaintiffs' 12(N), ¶ 31.)

Plaintiffs admit that Contractors and Skys have an oral management arrangement whereby Skys administrative personnel were and are responsible for maintaining Contractors' books, records and accounts and for such task as preparing Contractors income taxes and annual reports, processing Contractors' payroll and for making payments for expenses from Contractors' bank account on Contractors' behalf. (Plaintiffs' 12(N), ¶ 28). It is disputed whether it is common in the industry, for Skys to make advances to Contractors to allow Contractors to meet its payroll obligations and to thus ensure the continued performance of the installation work and requested modifications. (Plaintiffs' 12(N), ¶ 31).

From January 7, 1993 through May 31, 1997, Contractors cashed 192 checks from Skys. (Plaintiffs' 12(M), ¶ 74). The payments from Skys to Contractors also appear as entries on the Contractors' cash disbursement journal. (Plaintiffs' 12(M),

¶ 77). Contractors' cash disbursement journals reveal that Contractors operated consistently, on paper, at a negative balance. (Plaintiffs' 12(M), ¶ 80). Contractors paid no dividends to Skys between January 1993 and May 1997. (Plaintiffs' 12(M), ¶ 81). Contractors and Skys filed consolidated tax returns for years ending February 28, 1993; February 28, 1994; and February 28, 1995. The consolidating schedules for Contractors show that a management fee of $36,000 was charged to Contractors for services provided by Skys. The management fee charged was $3,000.00 per month. Contractors was not charged a management fee for year ending February 28, 1996.

Contractors cash disbursement journals show a number of entries. Skys' check, number 5912, to Contractors show on the memo line "# 417 payroll–7/29/95." (Plaintiffs' 12(M), ¶ 108). Skys' check, number 6270, to Contractors shows on the memo line "to cover McLean bill# 492." (Plaintiffs' 12(M), ¶ 109). Skys' check number 6665, to Contractors shows on the memo line "bal July payr, taxes, etc." (Plaintiffs' 12(M), ¶ 110).

Contractors cash disbursement journal shows an entry for July 10, 1996 of a deposit from "USI—(for airfare, paychex—IRS)." (Plaintiffs' 12(M), ¶ 111). There are no entries in Contractors cash disbursement journal that show any checks written to Skys for the period of January, 1993 through May, 1997. (Plaintiff 12(M), ¶ 79). However, during the same period, there are no entries in Contractors' cash disbursement journal that reflects any payment towards the advances. (Pl.12(m), ¶ 79). Further, Contractors' cash disbursement journal reflects that Contractors consistently operated on paper, at a negative balance. (Pl.12(m), ¶ 80).

When job superintendents, such as Michael Vogelsang, purchased items with their own funds, they were reimbursed from Contractors, if the expense related to installation. Typical expense items would include caulk, installation tools or equipment, such a crane or generator. (Defendants' 12(N)(3)(b), ¶ 122). When superintendents would travel to an installation job site they were paid travel advances for which they were required to account. The travel advances, and all travel expenses, were paid by Contractors because they related to installation, not to design or manufacture of skylights. (Defendants' 12(N)(3)(b), ¶ 123). None of the Contractors' checks identified with "exp" or "adv" is a payroll check. They are checks for reimbursement of expenses or advances. (Defendants' 12(N)(3)(b), ¶ 124).

Defendants stipulated that in calendar year 1994, Jack Donat received compensation for services rendered both from Skys and Contractors. In that same year, Skys' payroll records show Donat, Marrs, T. McCartney, Morman, Populoram, and Vogelsang as employees. In the same year, Contractors' pay sheets show Banks, Donat, Polpuloram, T. McCartney Morman, Palma, as employees. In the same year, Contractors' cash disbursement journals show checks written to Populoram, Marrs, Donat, and Morman. (Plaintiffs' 12(M), ¶ 113).

Defendants stipulated that in calendar year 1995, for services rendered no person received compensation from both Contractors and Skys in the same year. In the same year, Skys' payroll records show Donat, Kozak, Morman, Populoram, Vogelsang and Marrs as employees. In the same year, Contractors' payroll records show that Populoram, Donat, and Marrs were on the Contractors' payroll. In the same year, Contractors Cash Journal shows checks written to Donat, Populoram, Morman, Kozak and Marrs. (Plaintiffs' 12(M), ¶ 114).

Defendants stipulated that in calendar year 1996, no person received compensation for services rendered from both Contractors and Skys. In the same year, Skys' 1996 payroll records show that Vogelsang, Kozak, Morman, and Populoram were employees. In the same year, Contractors'

payroll lists show that Donat, Marrs and Populoram were on the payroll. In the same year, Contractors' Cash Journal shows checks written to Marrs and Morman. (Plaintiffs' 12(M), ¶ 115).

## DEFENDANTS' RELATIONSHIP WITH THE UNIONS

The scope of work covered under the Local 63 collective bargaining agreement is set forth at pages 3 through 7 of the Master Agreement. (Plaintiffs' 12(M), ¶ 2). The Local 63 collective bargaining agreement provides that the employer shall make contributions to the Architectural Iron Workers, Local 63 Welfare Fund, the Iron Workers' Mid–America Pension Plan, the Iron Workers, Local 63 Defined Contribution Plan, the Architectural Metal Trainees School and the Industry Advancement Fund and/or the Iron Industry Promotion Fund. (Plaintiffs' 12(M), ¶ 3). The collective bargaining agreement between Contractors and Local 63 also provides that contributions shall be paid on behalf of those individuals who perform work covered under the agreement. (Plaintiffs' 12(M), ¶ 4). The agreement between Contractors and Local 393 also provides that the employer shall pay contributions to the Iron Workers' Tri–State Welfare Plan and the Mid–America Pension Plan for all employees who perform work covered under that agreement. (Plaintiffs' 12(M), ¶ 5). Contractors has regularly filed pension benefit contribution reports and made contributions on behalf of many union employees. (Defendants' 12(M), ¶ 64). It is disputed, however, whether all contributions due and owing were paid. Over the years Contractors employed numerous union workers. (Exhibits 23–27).

Local 63 keeps records of requests from employers for persons to perform iron work. Local 63 had records which show that between September, 1993 and November, 1995, a person would call the hall to request iron workers for Contractors and Skys. (Plaintiffs' 12(M), ¶ 16). These rec-

ords consistently listed, Vogelsang, Moorman, Donet, Popularum as the person to see at the work site. (Plaintiffs' Exhibit 13).

In February 1993 Contractors submitted a contribution report to the Funds on behalf of Michael Vogelsang for work performed by him in January 1993. In January 1993 Vogelsang was an employee of Skys. (Plaintiffs' 12(M), ¶ 90).

In 1994, Candy Heinrikson's daughter, Courtney Heinrikson, who worked part time for Skys during high school, made a clerical error in processing one of Contractors' monthly contribution reports to the funds. Instead of typing the name "United Contractors" on the report, she typed the name "United Skys." (Defendants' 12(M), ¶ 68). When this error was discovered, Skys did not seek a refund for the contribution because Skys' president determined that the clerical work required to seek a refund was not worth the effort. (Defendants' 12(M), ¶ 69). In August 1994 Skys submitted a contribution report to the Funds on behalf of employees of Contractors for work performed in June 1994. The contributions were paid by Contractors. (Plaintiffs' 12(M), ¶ 91). In December, 1994, Jerry Johnson, National Sales Manager for Skys, wrote a letter on Skys' letterhead stationary to Jim Morton at the Iron Workers, Local 63 asking Morton to type a letter to Turner Midwest confirming that Contractors was signatory to an agreement with Local 63. The language which Mr. Johnson asked Mr. Morton to adopt stated "we have been informed that you are considering Contractors, Inc. as a subcontractor for the skylight trade on the above referenced project. We are pleased to report that USI is a signatory to a collective bargaining agreement with the following trades: skylights". (Plaintiffs' 12(M), ¶ 83).

In August of 1995, one of the plaintiff's auditors went to Contractors to examine Contractors' payroll records. (Plaintiff's 12(M), ¶ 15). During the examination of records, the auditor, Jean Dawson, discov-

ered that Contractors reported hours for bargaining unit work performed by Michael Vogelsang in January, 1993.(Id). Vogelsang during that time period was a superintendent employee of Skys, and plaintiff's admit that when the auditors began auditing Contractors he was told Mike Vogelsang was an employee of United Skys. It is undisputed that during 1991 Vogelsang served. as Vice President of Contractors. (Exhibit 14). Dawson asked to see the record of Skys and Skys refused that request. (Plaintiff's 12(M), ¶ 15). Plaintiffs further admit that Contractors has made all requested payroll records in its possession and control available to the Union's Pension Fund's Auditors, Piotrowski & Gebis. The only contributions made to the Funds for the superintendents employed by Skys, were on behalf of Vogelsang for work performed in January, 1993. (Plaintiff's 12(M), ¶ 15).

During Dawson's discovery of a common employee between Skys and Contractors, Skys refused Dawson's request to inspect Skys' accounting records to investigate the discrepancy. The plaintiffs filed this instant suit alleging that Skys is the alter ego of Contractors and Skys is required to comply with the collective bargaining agreement between the plaintiffs.

On March 4, 1998, Plaintiffs served a request for production of "any and all time records, including time cards, daily or weekly time records of the following United Skys' employees for the period January 1, 1993 through May 31, 1997: Marrs, McCartney, Morman, Populoram, Vogelsang, Banks, Donat and Kozak." Four of the sheets have "United Skys, Inc." at the top; three of the sheets have "United Contractors" at the top. The sheets which show "Contractors" at the top also reference check numbers on the bottom right hand side of the page. Only paysheets for USI 0242 references a check shown on the Contractors' cash disbursements journal. (Plaintiffs' 12(M), ¶ 92).

In response to Plaintiffs' request for Skys' employees time cards, Skys pro-

duced date stamped pages USI 0198, 0235, 0236, 0237. Each sheet showed the work "Contractors" crossed out and "Skys" handwritten above it. Skys stated that the change was made because "Contractors" was a "clerical error." The change was made when the payroll was generated. Either Charles McCartney or a payroll clerk made the change. (Plaintiffs' Exhibit 12(M), ¶ 93).

Skys had a "received' stamp which was stamped on letters that came into the office. Contractors did not have a "Received" stamp. Correspondence for Contractors was stamped with the Skys' "Received" stamp. (Plaintiffs' Exhibit 12(M), ¶ 94).

On September 25, 1995, Candice Heinrikson sent counsel for Plaintiffs a letter on Contractors stationary affixing a "post-it fax note" showing the facsimile was from Skys. (Plaintiffs' Exhibit 12(M), ¶ 95). On October 24, 1995 Charles McCartney, president of both Skys and Contractors, sent Plaintiffs' counsel a letter on Contractors stationary signed on behalf of Skys. (Plaintiffs' Exhibit 12(M), ¶ 96). Contractors served counsel for Plaintiffs with their responses to Plaintiffs' request for Production of Documents of August 26, 1997 on September 26, 1997 the last page of the response shows they were submitted "by United Skys, Inc." signed Daniel Kinsella. (Plaintiffs' 12(M), ¶ 97). Skys and Contractors are represented by the same attorneys in this case. (Plaintiffs' 12(M), ¶ 98). Skys issued an invoice for charges related to the copying and production of Contractors' general ledger. (Plaintiffs' 12(M), ¶ 99). McCartney testified that it was Skys' decision to get out of the installation business because the job was too difficult to supervise and Contractors was losing money (Plaintiff's 12(M), ¶ 100). Skys is not dependent on Contractors for referral work of any kind. (Defendants' 12(M), ¶ 53).

From 1993 through. 1997, Contractors was not listed in the Dontech phone direc-

tory for the Chicago far north suburban area in the yellow pages under "skylights," while Skys was listed. (Plaintiffs' 12(M), ¶ 84 & 85).

## DISCUSSION

"Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Schroeder v. Copley Newspaper*, 879 F.2d 266, 268 (7th Cir.1989). The moving party bears the burden of specifying "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) *(quoting Fed.R.Civ.P. 56(c))*. In response, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This requires more than merely showing "there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Summary judgment motions must be considered in light of both substantive law and the question of whether a reasonable jury could render a verdict in the non-movant's favor on that basis. *Board of Trustees of the Chicago Plastering Institute Pension Trust Fund v. William A. Duguid Co.*, 761 F.Supp. 1345, 1348 (N.D.Ill.1991). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita* at 587, 106 S.Ct. 1348. "That the parties have filed cross-motions for summary judgment does not mean that genuine issues of material fact necessarily do not exist." *William A. Duguid Co.* at 1348.

Because the parties are signatories to a collective bargaining agreement, the issue in this case is governed by 29 U.S.C. ¶ 1001, et seq., the Employee Retirement Income Security Act. ("ERISA"). The only issue presented in this motion is whether Skys is the alter ego of Contractors, and is thereby bound to fulfill Contractor's obligations under the terms of the two collective bargaining agreements entered into by Contractors and the unions.

### The Alter Ego Doctrine

■ "The alter ego doctrine (i.e., treating two nominally separate business entities as if they were a single, continuous employer) is applied to 'prevent an employer from gaining an unearned advantage in his labor activities simply by altering his corporate form.'" *N.L.R.B. v. Dane County Dairy*, 795 F.2d 1313, 1321 (7th Cir.1986). While used most commonly to root out " 'a disguised continuance of a former business entity,'" *International Union of Operating Engineers, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir.1987), the doctrine is equally applicable to situations in which the entity allegedly seeking to avoid its obligations exists side-by-side with its alleged alter ego. See *Central States, Southeast & Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593 (7th Cir.1990).

■ "The alter ego analysis is heavily fact-laden." *Id.* An alter ego relationship is usually found when two entities share "substantially identical: (1) management and supervision; (2) business purposes and customers; (3) operations; (4) equipment; (5) ownership." ―*Chicago District Council of Carpenters Pension Fund v. Vacala Masonry, Inc.*, 946 F.Supp. 612, 617 (N.D.Ill.1996). In addition, there must be an intent to avoid collective bargaining agreement obligations.

This Circuit discussed the alter ego doctrine in *Esmark, Inc. v. N.L.R.B.*, stating that [t]he Board's "alter ego" doctrine is similar [to the single employer doctrine]: generally, one corporation is the alter ego of another where the factors necessary to support a "single employer" finding are met and, in addition,

the Board finds that the second corporation is a "disguised continuance" of the employing enterprise, resulting in evasion of the employer's obligations under the labor laws. 887 F.2d 739, 754 (7th Cir.1989)

*Trustees of Pension Funds of Local 701 v. Favia Elec.,* 995 F.2d 785, 788, 789 (7th Cir.1993). Although no individual factor is dispositive in determining whether an alter ego relationship exists, "the Seventh Circuit considers unlawful motive or intent to avoid collective bargaining agreement obligations to be the critical elements of the inquiry." *Trustees of Pension Funds of Local 701 v. Favia Elec.,* 995 F.2d 785, 789 (7th Cir.1993). "What is essential for the application of the alter ego doctrine, though, is a finding of 'the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets. In sum, unlawful motive or intent are critical inquiries in an alter ego analysis....' *Int'l Union of Operating Engineers v. Centor Contractors,* 831 F.2d 1309, 1312 (7th Cir.1987)" *Trustees of Pension Funds of Local 701, supra,* at 789. If the application of these factors show that a corporation is the alter ego of another, the nonsignatory employer will be bound to the terms of a collective bargaining agreement entered into by the signatory employers.

## A. The Unlawful Motive or Intent Requirement

Since unlawful intent to avoid the obligations of a collective bargaining agreement is critical to the alter ego analysis the court begins with this factor. The crucial question is did Skys create or use Contractors so that it could do installation work without having to pay the contributions to the funds called for by the collective bargaining agreements between Contractors and the plaintiffs. Defendants claim that summary judgment should be granted in their favor because defendants possessed no unlawful motive or intent to avoid its collective bargaining agreement obligations, and that the analysis of the remaining alter-ego factors establishes that Skys is not the alter ego of Contractors.

Plaintiffs contend that summary judgment should be granted in their favor since unlawful intent is present because Skys disregarded its corporate form, Contractors was financially dependant upon Skys', Contractors automatically accepted jobs from Skys, and Skys relationship with Contractors enabled Skys to employ union employees without having made the required welfare contributions to the funds. Plaintiffs contend that first, Contractors employed union employees which they did not make benefit payments for and that second, Skys had its superintendents perform the installation work on behalf of Contractors in order to avoid paying these welfare benefits.

■ Plaintiff's position has some inherent weaknesses. First, Skys existed before Contractors and was never a signatory to the collective bargaining agreement. It therefore was under no obligation to pay contributions to the union funds before it created Contractors. It seems somewhat illogical, if Skys merely sought to avoid the union contribution requirements altogether, for it to create an entity, Contractors, to do installation work and then allow it to become a signatory to the very collective bargaining agreement it was trying to avoid. Why bother to create a Contractors at all? Why not simply have its supervisors, Morman, Donat and Vogelsang, and others do the installation as its employees? Defendants were perfectly free under the law to do exactly that. This would be much cheaper than hiring union workers at union wages, paying the bulk of their contributions through Contractors and then attempting to cheat on the payments for a few of them by designating them as Skys' supervisors. Plaintiff's theory makes little sense, and at any rate is far removed from the usual

alter ego theory in contributions cases. We find, as did the court in *Favia*, that far from attempting to evade union obligations, the defendants, by creating Contractors and allowing it to become a union shop, were responsible for benefit fund contributions that would not have otherwise been made. In short, defendants had no need to create an alter ego to avoid pension fund payments as they were under no obligation to make such payments in the first place. In fact, it was not until they created Contractors and allowed it to become a party to the collective bargaining agreement that any obligation to make contributions was created. It therefore makes no sense to accuse Skys of creating Contractors for the purpose of avoiding such contributions. Plaintiffs argue that through Contractors Skys was able to hire union laborers without paying contributions to their benefits funds. This is the supposed motive for the creation of Contractors. But, as pointed out above, Skys was free to hire anyone it wished without paying such contributions before Contractors was created. In addition, as pointed out below, Contractors hired a large number of union workers for which it did pay contributions. It is only are relatively few employees which Skys is accused of using and paying no contributions for. Such an illicit benefit, if true, could hardly be considered sufficient motivation for the substantial undertaking of creating, operating and maintaining an entirely new corporation. We find that the evidence fails to establish the unlawful motive or intent necessary for the application of the alter ego doctrine.

In addition, if, as the record supports, Skys has responsibility under its contracts for the proper installation of its custom lights, then it has a *legitimate* interest in having both a subsidiary corporation in existence to supply this needed service cheaply and efficiently, and its own employees on the site to supervise the work. It would be risky to leave the installation completely to an unrelated subcontractor. As pointed out above, Skys' current supervisor, Vogelsang, is able to ensure that the installation work that Skys' subcontracts out is being performed properly by the subcontractor's laborers and that the engineering concerns raised by the interface between Skys' custom product and the rest of the building are being satisfied (Defendants' 12(N)(3)(b), ¶ 130). He does this by working closely with the subcontractors' laborers, whether the subcontractor is Contractors or some other subcontractor, to instruct the laborers how to work with Skys' product, and, where necessary, demonstrate new techniques to the laborers. Vogelsang also measures Skys' product and checks the integrity of connections and seals. That such work closely interfaces with the actual installation can not be disputed, but neither can it be disputed that Skys has a legitimate interest in seeing to it that such close supervisory work is done so that its product will be properly installed and ultimately its customers will be satisfied with the overall results. Any supplier knows that no matter how good its product, if it is not installed properly the customer will not likely be a repeat customer. To the customer it's the end result that counts.

To support its assertion with respect to the installation work the superintendents allegedly performed, plaintiffs rely on the deposition of George Christos. While it is true that Christos testified that he witnessed Vogelsang and Morman doing "bargaining unit work" fourteen or fifteen times, it is still disputed whether the work he witnessed was solely installation work covered by the collective bargaining agreement or whether it was supervising of the installation work as defendants claim. Christos later in his deposition testified that Vogelsang was "in charge". Reading the deposition of Christos in its entirety a finder of fact could go either way as to what Vogelsang was doing. The same result as to Morman. This testimony is at best ambiguous and fails to satisfy plaintiffs' burden for it is insufficient simply to establish that superintendents did some

bargaining unit work. This alone will not make Skys liable for contributions under the collective bargaining agreement. Skys is free to do all of the bargaining unit work it wishes since it is not a signatory to the bargaining agreement. What plaintiff has alleged is an alter ego theory which would require proof that the main reason for Contractor's existence is so that Skys can get around the requirements of the collective bargaining agreement. Such a theory would make much more sense if Skys were attempting to get out from under its own collective bargaining agreement obligations and formed a new corporation that was not a signatory to take over what was essentially its prior work. But that is not the case. Skys has never been a signatory to the collective bargaining agreement and therefore has never had a need to create a sham company to help it squirm out of its obligations to the union funds. This lawsuit simply does not fit into the typical case in which a union company forms a non-union company in order to avoid the obligations of a principal's collective bargaining agreement. *Chicago Dist. Council of Carpenters Pension Fund v. CGI Contracting, Inc.,* 1996 WL 66008 (N.D.Ill. 1996). In view of this and the perfectly legitimate interest which Skys has in closely supervising the installation of its custom made product, the record here falls short of establishing a dispute as to an alter ego theory.

Furthermore, as defendants point out, plaintiffs had access to evidence from their members who worked on these same job sites on a day to day basis and could testify as to what they actually observed about defendant's superintendents—rather than rely on circumstantial evidence—but offered no evidence from them. In addition, plaintiff presents no testimony that union installers were not present on the job when defendant Skys' supervisors were working at these construction sites. Further, reviewing Exhibit 13 to plaintiffs 12(M) statement, which are the various dispatch papers kept by the Union showing dates on which Contractors called Local 63's hiring hall, reveals that Morman, Vogelsang and Donet were consistently disclosed as "who to see on the job." This is consistent with defendant's assertion that these gentlemen were in fact supervisors to whom the union workers were being sent for instruction and supervision at the site. This is entirely consistent with Skys's perfectly legitimate motive of establishing a reliable arrangement for accomplishing a crucial part of it's business. Likewise, Contractors 1991 annual report shows Vogelsang as a Vice President of the company. This is consistent with defendant's assertion that he was not an installer but rather a supervisor.

Finally, the fact that Skys automatically accepted Contractors installation jobs without all the contracting formality it goes through with outside subcontractors is not outcome determinative. As defendants have argued Contractors lost money and Skys subsidized the loss. This, once again, inured to the *benefit not the detriment* of the union workers and the fund.

In light of the burden on plaintiffs it is clear that plaintiffs have not established a set of facts which establishes even a legitimate dispute that Skys had the motive or intent to divert work away from the plaintiffs. The cash disbursement journals of Contractors reveals that it routinely made contributions to the unions welfare funds for numerous employees. Defendants have argued, four of Skys' payroll sheets for Morman, Mars, Vogelsang and T. McCarthy show "Skys" scratched out at the top of the payroll sheet and "Contractors" handwritten in. Plaintiff's contend that this exhibit is proof that Skys' role as the corporate parent of Contractors was in fact a disguised version of Contractors' role. But we find this exhibit to be ambiguous at best. Plaintiffs claim these payroll sheets are evidence of intent to avoid the collective bargaining agreement. Defendants respond that they are exempt from the terms of the collective bargaining agreement as superintendents/foreman.

That the administration of the two corporations was merged to a considerable extent can not be disputed, but plaintiffs fail completely in their burden of establishing an intent to avoid collective bargaining agreement responsibilities. They fail to show how creating an alter ego (Contractors) and allowing it to voluntarily become a signatory to the collective bargaining agreement places Skys in a better position to avoid benefit fund contributions than simply not bothering to create Contractors in the first place.

We look to the remaining factors of the alter ego analysis to determine whether they, as circumstantial evidence, help plaintiffs demonstrate the requisite intent. The remaining factors include whether the two enterprises share "(1) substantially identical management and supervision; (2) business purposes and customers; (3) operations; (4) equipment; and (5) ownership." *Board of Trustees of Chicago Plastering Institute Pension Fund v. William A. Duguid Co.*, 761 F.Supp. 1345, 1348 (N.D.Ill.1991).

### 1. Common Management or Supervision

■ In determining whether two ostensibly separate entities share common management, the Seventh Circuit and the National Labor Relations Board emphasize common control over hiring and firing of employees as well as other daily management decisions. *See NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279 (7th Cir. 1989). It is undisputed that Charles McCartney is the president of both Skys and Contractors and at all times, McCartney had the exclusive authority to hire, transfer, suspend, lay off, terminate, promote, reward, supervise and adjudicate complaints or grievances of Skys' supervisory and administrative personnel as well as other management decisions. He did clearly have the concurrent authority to hire and fire both Skys' and Contractors' employees However, McCartney's practical authority with respect to Contractors employees was likely much more limited. Since these employees were hired from the union hall and McCarthy's authority over these employees was limited to hiring and firing them. He hired them from the union hall and let them go once the project was completed. He could not do much more than that.

It is also undisputed that Paul Matik, Jr. is the accountant for both Skys and Contractors; and Candice Heinrikson is the office manager of Skys and performs administrative functions for both Skys and Contractors. The record reflects Matik and Heinrikson are employees of Skys and the services provided by Matik and Heinrikson on behalf of Contractors was compensated by Skys only. (While Matik can be concluded to be management it's a stretch to categorize Heinrikson as management). Technically a management fee of $3,000 was ostensibly charged to Contractors for a period of time but it is undisputed that Contractors never reimbursed Skys for this fee. It is also undisputed that Mike Vogelsang and Hans Abramat were officers and directors of both Skys and Contractors but Mike Vogelsang was only a director of Skys in 1991. Thus the record reveals substantial overlap in the management at the administrative level as well as direct supervision at the operational level. None of this however, is in any way inconsistent with Skys' legitimate purposes for establishing a wholly owned subsidiary corporation to do the installation of its custom product.

Likewise, the following individuals at one time were employed by Skys as superintendents to oversee the installation of skylights by Contractors: Steven Marrs, Paul Morman, Jack Donat, Aaron Kozak, Jeff Populoram, Brad Banks and Terry McCartney. Skys currently has only one superintendent, Michael Vogelsang. While the duties of Skys' superintendents included requesting these laborers from the hiring hall and possibly letting them go once the project was finished nothing in the record indicates that at any time, these

individuals had any other authority, i.e. disciplining, rewarding, adjudicating employees complaints, etc. over these employees. On the other hand, there is absolutely no evidence in the record that these superintendents had any supervisory authority over employees of Skys. Their supervisory authority only extended to Contractors' employees, not Skys. That Skys had superintendents whose only function was to supervise the work of Contractors' employees is also substantial evidence of overlap in management at the operational level.

In *Chicago District Council of Carpenters Pension Fund v. Vacala Masonry Inc.* 946 F.Supp. 612 (N.D.Ill.1996), analogous to the present case where common supervision was alleged by the plaintiffs, the Court found that the form of supervision exercised by the Skys' superintendents over Contractors' job site is nothing more than the kind of supervision normally required and customary between a general and subcontractor. The *Vacala* Court held that no common supervision existed between the two entities in this situation. Thus, the evidence points both ways as to the issue of common management, which is not unusual for a wholly owned subsidiary situation.

### 2. Same Business Purpose and Customers.

Plaintiffs contend that the two entities share a common business purpose as both are in the skylight installation business. It is undisputed that Skys is a designer, fabricator, and manufacturer of large architectural skylights, atriums and Glashouse pool enclosures with moveable roofs. Skys sells its Glashouse pool enclosures to distributors around the country. There is no evidence in the record that Contractors has anything to do with Skys' Glashouse pool product. This, then, is one very substantial business purpose not shared by Contractors.

As to the custom skylight portion of Skys business there is absolutely no evidence in the record as to any overlap or commonality with respect to the manufacturing function employees. Skys does many things which Contractors has nothing to do with. As pointed out above, when Skys is approached by a customer. McCartney, Skys' president, and Hans Abramat would review the proposal. Abramat would then generate an estimate to complete the work which includes engineering, manufacturing, and installation. McCartney would review the estimate generated by Abramat and ultimately Skys would bid a lump sum to provide materials and/or labor.

A structural engineer would then review the preliminary design and engage in considerable consultation with materials vendors to determine the content, strength and flexibility of the vendors' products in varying sizes, under varying temperatures and when used in combination with different materials. Sky's employees would also test different combinations of materials to prove that the preliminary design will perform properly and, if necessary, make modifications in the design or materials as a result. This "design and engineering process" requires hundred of hours of work and culminates in precise materials specifications and drawings of each pane of glass and silicon, each piece of steel, aluminum or plastic, and each screw, clamp, or bead of caulk. (Defendants' 12(M), ¶ 13). Skys' Materials Manager arranges for the purchase and delivery of the necessary materials to Skys' facility. Skys' Plant Manager establishes a production schedule and the material received goes into "fabrication." The shop fabricators start assembling the base product. The fabricators punch, drill, and cut aluminum extrusions. Once the extrusions are complete, Skys' finisher effectively smooths the edges of the base product to ensure that connections and interfaces are sound. If the product meets specifications, it is shipped or otherwise delivered to the work site (Defendants' 12(M), ¶ 14) and is now ready for installation. As to these business func-

tions there is no overlap—even in the skylight portion of Skys' business.

With respect to the installation of the custom skylights there is a some overlap as to business purpose. That is, both Skys and Contractors share a common purpose, i.e., to successfully install the custom skylight. But as can be seen from the description above, this is only a small portion of Skys' business, while it is all of Contractor's business purpose—a common situation with wholly owned subsidiaries. Furthermore, just because they may share this small portion of Skys' business purpose, does not mean that they engage in the same functions. Skys claims that is engaged in the installation of these skylights only in the sense that it supervises the actual work because it is ultimately responsible pursuant to the terms of its contracts with its general contractors for the installation of the skylights.

■ As mentioned above, Skys' position is much like that of a general contractor overseeing an entire project, while Contractors is only responsible for performing the installation work on given projects. The Court finds no conclusive evidence to indicate that Skys actually performed the work of installing the skylights other than taking responsibility for the ultimate outcome and subcontracting the work out to an outside installer—usually, Contractors. See *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1337 (9th Cir.1988) (fact that one company builds large block walls for housing tracts and the other builds small block wall for individual private residences supports non-alter ego finding), and *Duguid*, 761 F.Supp. at 1353; (fact that one company performs plastering work on large jobs as part of diverse operations while the other performs plastering work as subcontractor on smaller jobs supports finding that companies do not share same business purpose). Therefore, it cannot be concluded that Skys and Contractors had identical business purposes or common customers.

### 3. Identical Business Operations

As construed by both the National Labor Relations board and the Seventh Circuit, this prong of the alter ego analysis inquires whether one company is dependent upon the other for financial support, whether they share the same facilities, and whether they function jointly on a daily basis. *See, Central States Pension Fund v. Sloan*, 902 F.2d at 597; *Hageman Underground Construction*, 253 NLRB 60(1980). It is undisputed that Contractors was financially dependent on Skys. This is evidenced by Contractors' cash disbursement journal which reflects that Skys funded Contractors' payroll and other operating expenses and that there were no independent sources of cash flow other than from Skys. Between January 7, 1993 through May 31, 1997, Contractors cashed 192 checks from Skys. Also during this period, Contractors' cash disbursement journal reflects that no checks were issued to Skys to reimburse for the cash advances or to make payments to Skys for the $3,000 monthly administrative management fee. McCartney testified that Contractors was not charged a management fee for the year ending February 28, 1996. The record also indicates that Contractors' was unable to pay this management fee to Skys since Contractors' cash disbursement journal consistently operated at a negative balance.

It cannot be concluded, however, that they share the same facilities and they function jointly on a daily basis. The installation business of Contractors was very much distinct from the manufacturing and production business of Skys. The plaintiffs assert that both companies shared the same facilities at 702 Magna Drive, Round Lake, Illinois. In particular they point out that since administrative services were performed for Contractors by some Skys' employees at the facility in Round Lake, this is evidence that the two entities shared a common facility. To the extent that Skys' employees did the administrative work of Contractors at that facility,

this is true. However, the evidence also establishes that Contractors rented temporary facilities at installation construction sites. These sites were used by Contractors to supervise the progress of the installation operations. The union laborers employed by Contractors would report to these sites and would pick up their payroll checks from the construction sites. The evidence does not indicate that any of Contractors' union employees were ever employed to work at the facility in Round Lake.

A further consideration in the analysis is whether the two entities function jointly on a daily basis. The evidence indicates that Skys and Contractors shared the same office space with respect to administrative functions only. The evidence indicates that Contractors' primary business purpose of installing skylights was directed from temporary trailers located on the construction sites and not out of Skys' facility in Round Lake. Skys production of its Glasshouse pool enclosure and custom skylights took place at the Round Lake facility. Hence, the evidence is split.

### 4. Shared Equipment

Plaintiffs have established that Skys and Contractors share two vehicles. Despite the denial by the defendants that this factor is not met, the undisputed facts support plaintiffs' assertion. The plaintiffs produced two titles which show that Skys and Contractors jointly own two vehicles. One vehicle is a Dodge D–150 truck and the other is a Ford F–250 truck. The Ford is used to transport Skys' employees from the plant to a Contractors' job site to supervise the installation of skylights by Contractors. However, is also undisputed that Contractors on many occasions rented equipment for its installation projects and there is no evidence that this equipment was shared by Skys. Therefore, the evidence points both ways as to the issue of shared equipment.

### 5. Common Ownership

Both parties agree that this factor is satisfied. Contractors is the wholly owned subsidiary of Skys. Therefore, it is undisputed that both corporations were commonly owned.

As stated in the beginning the basic dispute this court was asked to resolve was whether Skys worked with Contractors as a bona fide subsidiary or whether Skys was merely a disguised version of Contractors. Although some of the evidence presented by plaintiffs may be considered to support the theory that Skys is Contractor's alter ago, or at least present a genuine issue of fact, much of the evidence belies this allegation. More to the point, for the reasons stated above, we find that no rational trier of fact could conclude that Skys created or is using Contractors with the intent to avoid collective bargaining agreement obligations. There being no genuine issues of fact as to this critical element of the plaintiffs' alter ago theory, defendant United Skys Inc is entitled to summary judgment.

### CONCLUSION

For the reasons set forth above plaintiffs' motion for summary judgment is denied and defendants' granted. The parties order to appear before this court on March 24, 1999 at 9:30 am to schedule a hearing date as to the issue of the delinquent contributions owed by Contractors to plaintiffs.

**SO ORDERED**